**STANDARD CHARTERED BANK PLC, Plaintiff,**

v.

**AYALA INTERNATIONAL HOLDINGS (U.S.) INC., Defendant.**

**AYALA INTERNATIONAL HOLDINGS (U.S.) INC., and Ayala International Shipping (U.S.) Inc., Counterclaimants,**

v.

**STANDARD CHARTERED BANK PLC, Counterdefendant.**

No. 85 Civ. 3473 (LBS).

United States District Court, S.D. New York.

July 16, 1986.

Kurt J. Wolff, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for plaintiff and counterdefendant Standard Chartered Bank.

Martin D. Edel, Miller & Wrubel, P.C., New York City, for defendant and counter-claimants Ayala Intern. Holding etc. and Ayala Intern. Shipping etc.

## OPINION

SHARON E. GRUBIN, United States Magistrate:

At a conference on June 11, 1986 I made certain rulings concerning the attorney-client privilege in this case. Plaintiff has asked that I reconsider those rulings after submission of papers. After review of all submissions, I adhere to my original rulings for the reasons set forth below.

## BACKGROUND

Plaintiff, Standard Chartered Bank PLC, ("SCB") filed this action in May, 1985 seeking damages against defendant, Ayala International Holdings (U.S.) Inc., ("Ayala") for breach of contract and fraudulent inducement in connection with Ayala's agreement to guarantee payment to SCB of indebtedness of Behring International Inc. ("Behring"). The complaint alleges that pursuant to certain financing agreements entered into commencing in 1981, SCB extended credit to Behring. Ayala acquired a majority of the stock of Behring in September, 1984. In March, 1985 SCB allegedly advised Behring and Ayala that it intended to cease to extend credit to Behring and would demand immediate repayment of Behring's outstanding indebtedness to SCB unless, among other things, Ayala would unconditionally agree to guarantee payment. The complaint further alleges that Ayala did agree in writing to guarantee payment up to $2,000,000. In reliance upon such guarantee, SCB continued to extend credit to Behring and did not demand immediate repayment. In April, 1985 Behring filed a petition under Chapter 11 of the Bankruptcy Act. Ayala has allegedly refused to make any payment pursuant to the guarantee despite proper demand.

Ayala has filed seven counterclaims against SCB which basically are premised upon alleged oral representations made by SCB to Ayala concerning SCB's loans to Behring. Ayala contends that prior to buying its majority interest in Behring it discussed the matter with SCB and obtained SCB's oral agreement that SCB would not declare Behring in default of the outstanding loan agreements, would continue to extend credit to Behring, would not demand immediate repayment and would renegotiate the debt to allow for gradual repayment. Ayala alleges that it was in reliance upon these oral representations by SCB that Ayala purchased the Behring stock. Ayala contends that despite its representations, SCB "pulled the plug" on Behring, causing the business failure of Behring and consequent financial loss to Ayala. Ayala's counterclaims allege, among other things, breach of the oral agreements and fraud.

In connection with Ayala's purchase of Behring, Ayala was represented by the law firm of Pettit & Martin. SCB argues on its present motion that it is entitled to disclosure of *all* communications, without exception, between Ayala and its attorneys Pettit & Martin concerning the Behring acquisition because, by interposing its counterclaims alleging reliance upon SCB's oral representations in purchasing Behring, Ayala has waived any attorney-client privilege. SCB contends that it is entitled to this disclosure to show that Ayala did not justifiably rely upon any oral representations of SCB in deciding to purchase Behring but rather relied upon its own business judgment and the guidance of its attorneys. SCB also seeks disclosure of documents provided to Pettit & Martin by the accounting firm of Price Waterhouse & Co. which was retained to aid in Ayala's acquisition of Behring. SCB's contentions can perhaps be best summed up by the following explanation of its counsel at the June 11 conference:

"I believe that I am entitled to every document that was generated by whomever it was generated, that relates to information, and provided to Ayala, which involved its acquisition of its interest in Behring including, without limitation, reports of accountants, reports of lawyers, reports of investment bankers, reports of bankers, reports of Ayala's own personnel, on the grounds that those relate to the question of on what did Ayala rely in making its investment in Behring and what information did it have which led it to make its investment in Behring."

(Transcript of conference held on June 11, 1986 at 8.)

## DISCUSSION

The attorney-client privilege is the "oldest of the privileges for confidential communications known to the common law." *Upjohn v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* The privilege applies to communications made in confidence by a client to an attorney for the purpose of obtaining legal advice. It also applies to confidential communications made by the attorney to the client if such communications contain legal advice or reveal confidential information on which the client seeks advice. *See, e.g., Upjohn Co. v. United States*, 449 U.S. at 391, 101 S.Ct. at 683; *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444 (S.D.Fla.1980); 8 J. Wigmore, Evidence § 2320 at 628 (McNaughton rev.1961).

■ The privilege protects *communications* between the client and his attorney; it does not protect *facts* which the client communicates to the attorney:

"[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant

fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."

*Upjohn v. United States*, 449 U.S. at 395–96, 101 S.Ct. at 685–86 (quoting *Philadelphia v. Westinghouse Electric Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962) (emphasis in original)). *See also* 4 Moore's Federal Practice ¶ 26.60[2] at 26–193–94 (2d ed. 1984). Similarly, the privilege does not protect facts which an attorney obtains from independent sources and then conveys to his client. *See Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947); 8 C. Wright and A. Miller, Federal Practice and Procedure § 2017 at 137 (1970); 8 J. Wigmore, *supra*, § 2317 at 619.[1] Furthermore, the privilege only applies when the lawyer is acting as a lawyer, *i.e.*, giving legal advice. When a lawyer acts as a business or economic advisor, there is no special relationship to give rise to a privilege to protect his advice from disclosure. *See, e.g., In Re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1037 (2d Cir.1984); *Coleman v. American Broadcasting Cos., Inc.*, 106 F.R.D. 201, 205–06 (D.D.C.1985); 8 C. Wright & A. Miller, *supra*, § 2017 at 136–37.

■ Thus, in the instant case, Ayala must disclose to SCB all facts of which Ayala was aware at the time of the Behring acquisition, whether or not those facts were communicated by Ayala to Pettit & Martin and whether or not those facts were learned by Ayala from Pettit & Martin. Ayala must also disclose any business advice it may have received through Pettit & Martin that would not reveal the substance of confidential communications acquired by Pettit & Martin as attorneys for the purpose of rendering legal advice. In sum, SCB is entitled to learn from Ayala each and every fact on which it relied in deciding to purchase Behring's stock. But SCB maintains that this is not enough. SCB contends it is entitled to disclosure of the actual privileged, confidential *communications* Ayala made to its attorneys and its attorneys made to it.

## A. *Implied Waiver*

■ SCB's main argument is one of implied waiver of the attorney-client privilege: that by Ayala's voluntary assertion of its counterclaims, an element of which is justifiable reliance on SCB's oral representations, Ayala has waived any privilege otherwise applicable to any communication concerning Ayala's acquisition of Behring.

The most often-cited formulation of the doctrine of implied waiver is that in *Hearn v. Rhay*, 68 F.R.D. 574, (E.D.Wash.1975), on which SCB relies herein:

"All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct."

68 F.R.D. at 581. *Hearn* was a prisoner's civil rights suit in which the defendants asserted the affirmative defense of good-faith immunity. Because the immunity de-

---

**1.** Such factual information, however, may be entitled in certain circumstances to qualified protection from disclosure under the work-production doctrine. That doctrine, however, appears inapplicable to the instant situation because there is no claim that the information sought was "prepared in anticipation of litigation or for trial." Fed.R.Civ.P. 26(b)(3).

fense necessarily placed in issue the advice the defendant prison officials had received from the attorney general of the state of Washington, the court found that the defendants had impliedly waived the privilege against disclosure of that advice: " ... the court finds that, due to the nature of this suit, which puts the legal advice defendants received directly in issue, the policy behind the privilege is outweighed by the necessity of disclosure and the privilege is inapplicable." *Id.* at 583. In a decision rendered shortly after the *Hearn* case, Judge Knapp of this court had occasion to explain the *Hearn* ruling:

> "The actual holding in [*Hearn* ] is not in point because the party there asserting the privilege had expressly relied upon the advice of counsel as a defense to the plaintiff's action. The Court therefore had no difficulty in concluding that such reliance upon the advice of counsel as a defense precluded any objection to inquiries concerning the circumstances under which the advice had been given and what the advice actually had been."

*Connell v. Bernstein-Macaulay, Inc.*, 407 F.Supp. 420, 422 (S.D.N.Y.1976).

Contrary to SCB's argument in its brief, this case is not similar to the *Hearn* situation, and the three factors considered by the *Hearn* court to establish waiver are not "more than satisfied" here. The assertion of the privilege here is in a broad sense the result of Ayala's affirmative act of bringing its counterclaims, thus satisfying the first *Hearn* factor.[2] However, the second factor—that the asserting party has put the protected information in issue by making it relevant to the case—is not present here. Ayala's confidential communications to its attorneys and the legal advice rendered by its attorneys have not been placed in issue, as discussed below. For this reason, the third *Hearn* factor is also lacking

here—the privileged information is not vital to SCB's case.

What is relevant to the counterclaims here is not what counsel said to Ayala or Ayala said to counsel, but what Ayala knew or should reasonably have been expected to know prior to acquiring the Behring stock. To be sure, as in every lawsuit, it would be useful and convenient for SCB to obtain Ayala's privileged material, and the substance of its confidential communications with its attorneys might reveal some of what Ayala knew. But those are not reasons to void the attorney-client privilege. Ayala's privileged communications are not the only available means by which SCB can learn what Ayala knew. Plainly and simply, Ayala, if asked in discovery, must itself reveal what it knew. Nor is any *legal* advice rendered by Pettit & Martin to Ayala concerning acquisition of the Behring stock relevant to the issue of whether Ayala justifiably relied on the alleged oral representations of SCB. SCB proffers only one specific example of how privileged information might be relevant to Ayala's claim of reliance. In an internal memorandum written by Ayala's Vice-President concerning the proposed Behring acquisition and produced by Ayala in the course of discovery herein, the "agreements" of SCB to refrain from declaring Behring in default are discussed. The memorandum goes on to state: " ... we have the feeling that the bank is very sincere about the position it has shown to us. We have no reason to substantiate the apprehension of the lawyers that we should insist on a bullet-prof [sic] kind of agreement with the bank."[3] SCB contends that deposition testimony has established that the "apprehension of the lawyers" was in Ayala's not obtaining a written agreement from SCB. SCB argues on the instant motion that "SCB is entitled to know the

**2.** However, given that the counterclaims would most likely be viewed as compulsory, the "voluntariness" of asserting the counterclaims is questionable. To hold that a waiver has been effected in such circumstances could give plaintiffs who are skillful at pleading their own claims the ability to force defendants to choose

between voiding the privilege or never bringing a valid claim.

**3.** Ayala contends that the latter sentence was produced inadvertently and the memorandum should have been produced in redacted form. (See pp. 85–86, *infra.*)

content of that advice [concerning the need for a written agreement] and whether Ayala's purported decision to rely on SCB's alleged oral representations was made in spite of its attorney's statements." (SCB's Memorandum of Law filed June 23, 1986 at 6.)

I do not agree. Pettit & Martin's advice or opinion as to whether Ayala's agreement with SCB should be in writing to be binding as a *legal* matter is not relevant to whether or not the agreement will be found binding in this case. Whatever advice, right or wrong, that Ayala received from its attorneys concerning the need for a written agreement, and whether or not Ayala disregarded its attorneys' advice, are irrelevant to the issue of whether Ayala actually relied on SCB's oral representations. I fail to see how any privileged legal *opinion* rendered by Pettit & Martin can bear upon the issue of whether Ayala actually did rely on SCB's statements and whether, as a matter of law, it was entitled to so rely based on all the facts known to it. Information on the former question can be obtained from Ayala, and the latter question is to be determined by proceedings in this court, not by the opinion of Ayala's lawyers. SCB is not entitled to learn from Ayala what Ayala's lawyers told it concerning any need for a written agreement. But SCB may ask what Ayala's belief or understanding was concerning the need for a written agreement, for Ayala is required to disclose its thoughts and knowledge, whether or not acquired from conversations with its attorneys. The situation is similar to that considered by Judge Owen in *Chase Manhattan Bank, N.A. v. Drysdale Securities Corp.*, 587 F.Supp. 57 (S.D.N.Y.1984). Chase sued Arthur Andersen & Co. on an allegedly fraudulent opinion concerning a company in which Chase traded securities. Arthur Andersen sought access to communications from Chase's legal department given to Chase while the trading was being conducted concerning whether Chase stood as a principal, fully liable for any financial exposure, or as a mere agent in the transactions. Arthur Andersen reasoned that the justifiability of

Chase's reliance on the allegedly fraudulent opinion must be viewed in the context of Chase's own perception of its exposure. It argued, just as SCB argues here, that in pleading fraud Chase put the question of its justifiable reliance in issue and therefore waived the privilege. Judge Owen rejected this argument:

"In this case, Andersen asserts that there is a waiver implied by Chase's filing of the securities fraud suit, which includes justifiable reliance as an element. This is said to put the prudence of Chase's behavior in issue, possibly to break the chain of causation flowing from the misrepresentations in Andersen's original opinion. While it may be useful to Andersen to know the substance of the advice Chase received concerning its liability on the transaction, *I do not believe that the communications are essential to establish of what a reasonably prudent bank should have known and should have done under the circumstances.*"

587 F.Supp. at 58 (emphasis added).

The cases cited by SCB do not persuade me otherwise. SCB places great weight on a recent decision of the Supreme Court of Nebraska, *League v. Vanice*, 221 Neb. 34, 374 N.W.2d 849 (1985). I do not find that case applicable to this one. There, the plaintiff filed suit after the ostensible running of the statute of limitations. To avoid dismissal, the plaintiff alleged his lack of knowledge regarding the wrongs allegedly committed by the defendant because of the defendant's concealment thereof. The court held that the plaintiff waived the attorney-client privilege concerning communications bearing upon his knowledge of the transactions of the defendant about which he claimed lack of knowledge. During the trial below, an attorney who had represented the plaintiff during the time in question had testified over objection that he had informed the plaintiff that the defendant was engaging in the transactions at issue. The attorney testified that these facts had come to his own attention in another connection. With all deference to

the Nebraska court (and based merely upon the facts set forth in the opinion), I am of the belief that the question of waiver would not apply to this information because it was not privileged. If the attorney learned these facts from an independent third source and then told them to the plaintiff, they are merely facts of which the plaintiff was aware. A party's knowledge of facts, from whatever source, is not privileged. (*See* pp. 79–80, *supra*.) The attorney had also testified that the plaintiff had considered filing suit earlier, but did not do so because "there wasn't a lot of gravy on the table to be litigated." This testimony does appear to have revealed privileged information. There, however, as distinguished from this case, the very essence of the plaintiff's contention was that he could not have brought his suit earlier because he lacked the knowledge, due to the defendant's concealment, that the defendant was committing the acts upon which suit was ultimately brought.[4] In this case, the issue does not concern Ayala's knowledge of particular events of which it claims lack of knowledge, but rather whether Ayala acted reasonably in relying upon SCB's oral assurances. Its reliance is to be judged by the factual information and knowledge it had, whether received from Pettit & Martin or other sources.

The other cases upon which SCB relies are even less persuasive. In *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444 (S.D. Fla.1980), the issue was the intent behind language of certain contracts. Moreover, the court noted that there was no other source of proof going to the issue other than privileged communications. In *Connell v. Bernstein-Macaulay, Inc.*, 407 F.Supp. 420 (S.D.N.Y.1976), the issue was again the statute of limitations. Plaintiffs claimed defendants were estopped from asserting the statutory bar because they had prevailed upon plaintiffs to withhold suit at an earlier time. The court's holding was narrow: " ... where a litigant seeks to avoid a statutory protection which has been established for the benefit of his adversary (e.g. a statute of limitations), by a claim that his adversary is estopped to assert such protection; and where it appears that there is a good faith basis [in memoranda already produced] for believing that invasion of the attorney-client privilege would shed light on the validity of such claim of estoppel; the party making such assertion must be deemed to have waived the privilege." 407 F.Supp. at 423. *United States v. Exxon Corp.*, 94 F.R.D. 246 (D.D.C. 1981), involved, similar to *Hearn v. Rhay*, the issue of the defendant's defense of good faith compliance with governmental regulations. The court found that the only way to assess the validity of this good faith defense was to investigate attorney-client communications.

What appears common among these cases relied upon by SCB finding waiver of the privilege is (1) the very subject of privileged communications was critically relevant to the issue to be litigated, (2) there was a good faith basis for believing such essential privileged communications existed, and (3) there was no other source of direct proof on the issue. For reasons already discussed above, these considerations are not present herein.[5]

---

**4.** Again, with all due respect to the Supreme Court of Nebraska, I am of the opinion that admission of this latter part of the attorney's testimony in *League* was error. The issue was whether the plaintiff in that case was aware of the facts of which he claimed to have been unaware. It was established through non-privileged information that he had been aware of them because his attorney had imparted them to him. Whether or not he considered with his attorney filing suit at an earlier time should not have been disclosed. There was no necessity for a finding of waiver. While I thus disagree with the holding in *League,* the circumstances of that case were such as to make the holding inapposite here in any event.

**5.** SCB also cites *Jack Winter, Inc. v. Koratron Co.,* 50 F.R.D. 225 (N.D.Cal.1970). The opinion in that case, however, does not reveal the facts necessary to understand the court's holding. The allegations of the third-party complaint are not explained, and it would appear from the language of the opinion that the complaint may have placed the content of the attorney's advice directly in issue, apart from simply pleading "duress". Moreover, a later decision in the same case, *Jack Winter, Inc. v. Koratron Co.,*

*Sedco International, S.A. v. Cory,* 683 F.2d 1201 (8th Cir.), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982), is a case upon which both SCB and Ayala rely. The plaintiff there, an oil drilling company, brought suit seeking payment for services rendered under an agreement with the defendant investor. The defendant filed a counterclaim alleging that plaintiff induced him to invest in the project by fraudulent misrepresentations concerning the possibility of extracting oil from certain wells. The plaintiff, making the same arguments SCB makes here, sought disclosure of privileged communications between the defendant and his attorneys. Plaintiff argued that the failure to disclose the content of the defendant's attorneys' advice prevented it from proving that the defendant did not rely on plaintiff's misrepresentations or that such reliance was not reasonable. It similarly argued that all advice given to the defendant by his attorneys was part of his "intelligence and information" and that the court could not judge the reasonableness of the defendant's reliance without knowing what his attorneys had told him. The court's holding is somewhat curious. On the one hand, the court concluded that "by asserting fraud, [defendant], at most, waived his right to assert the privilege to prevent disclosure of communications which might have proven he did not rely on [plaintiff's] employees' statements or that such reliance was unreasonable." 683 F.2d at 1206. This holding would appear to support SCB's position to some extent.[6] On the other hand, the court went on to hold that actual privileged communications would not be relevant to the issue of reliance and did not have to be produced:

> "[Defendant] presented persuasive evidence that he acted in reliance on [plaintiff's] employees' statements. [Defendant's] attorneys' statements are relevant to this issue only if they might demon-

strate that [defendant] acted as he did for reasons unrelated to the [plaintiff's] misrepresentations....

\*　　\*　　\*　　\*　　\*　　\*

[Plaintiff] fails to suggest and we cannot imagine what [defendant's] attorneys could have told him, without first acquiring factual information from other sources, which might demonstrate that [defendant] acted for reasons unrelated to [plaintiff's] employees' representations.

\*　　\*　　\*　　\*　　\*　　\*

The problem with plaintiff's argument is that only certain types of information could have made [defendant's] reliance unreasonable. [Plaintiff] does not suggest and *we cannot perceive how receipt of ordinary legal advice could have made reliance unreasonable.* Only evidence that [defendant] received new factual information or technically expert analysis of known facts might have revealed that reliance was unreasonable....*It is difficult to perceive that counsel's own opinions on strictly commercial subjects, if any were expressed to [defendant], could have made [defendant's] reliance on [plaintiff] unreasonable.*"

683 F.2d at 1206–07 (emphasis added). As set forth above (*see* pp. 81–82, *supra*), I similarly do not see how Pettit & Martin's *legal* advice could be relevant to the issue of Ayala's reliance on SCB's representations.

■ What is particularly disturbing about SCB's position on waiver is that it would render meaningless the important and time-honored policies behind the attorney-client privilege. Privileged communications are to be "zealously protected." 8 C. Wright & A. Miller, *supra,* § 2017 at 134. If SCB's position were correct, the

---

*Inc.,* 54 F.R.D. 44 (N.D.Cal.1971), in which the same court staunchly upheld the privilege (" ... it is important that the attorney-client privilege not be down-graded in the interests of expedient results"), while still not shedding light on the relevant facts, appears to go against SCB's position.

6. SCB, however, does not claim waiver with respect to a limited category of communications; it seeks disclosure of every communication concerning Ayala's acquisition of Behring of whatever subject matter.

privilege would be a nullity in all the vast commercial litigation in which fraud or reliance is an issue. Whenever parties entered into a transaction, they would have to restrain themselves from free and frank communications with their attorneys in the realization that all their confidences would be revealed if litigation on the transaction were ever to ensue. SCB wants every communication between Ayala and its attorneys involving a large corporate transaction in the hope that it will uncover something useful to its case. But the burden is particularly high on one seeking to pierce the attorney-client privilege. *See, e.g., Chase Manhattan Bank v. Drysdale Securities Corp.*, 587 F.Supp. at 58; *Hearn v. Rhay*, 68 F.R.D. at 582. Waiver of the privilege should be found only when the benefit to be gained from disclosure outweighs the resulting injury to the attorney-client relationship. *See* 8 J. Wigmore, *supra*, § 2285 at 527.

### B. *Express Waiver*

SCB additionally argues that production of the Ayala memorandum indicating Ayala's attorneys' advice that Ayala insist upon a "bullet-proof" written agreement from SCB (*see* p. 81, *supra*) has effected a waiver of privileged communications relating to the same subject matter. The language allegedly effecting the waiver is contained in one sentence of a five-page, single-spaced memorandum: "We have no reason to substantiate the apprehension of the lawyers that we should insist on a bullet-prof [sic] kind of agreement with the bank." Ayala's counsel states that this sentence was produced inadvertently—that it should have been redacted from the memorandum before production. The attorney having primary responsibility for assembling, reviewing and producing Ayala's documents has submitted a declaration under the penalty of perjury indicating that his review encompassed sixteen "Banker's Boxes" of documents consisting of more than 5,000 pages. The production in which this memorandum was contained included 200 documents in excess of 1,000 pages. Counsel states that neither he nor Ayala

intended a waiver of the attorney-client privilege. (Declaration of Richard Moore dated June 25, 1986.)

It is true that the voluntary production of a privileged document effects a waiver of the privilege as to all other privileged communications concerning the same subject matter. This is so because fairness and full disclosure cannot permit a party to selectively choose to produce only those communications which may be favorable to him and withhold on grounds of privilege others which may be favorable to his adversary. The key, however, is that the production have been voluntary or that procedures with regard to maintaining the confidentiality of the document were so careless and indifferent to consequences as to constitute a waiver. *See, e.g., Eigenheim Bank v. Halpern*, 598 F.Supp. 988 (S.D.N.Y.1984); *Data Systems of New Jersey, Inc. v. Philips Business Systems, Inc.*, No. 78–6015, slip op. (S.D.N.Y.1981). The three cases upon which SCB relies in its briefs stand merely for the proposition that voluntary disclosure effects a waiver. They do not involve a claim of inadvertent disclosure.

The inadvertent disclosure of one isolated document among many produced does not automatically effect a waiver. *E.g., Data Systems of New Jersey, Inc. v. Philips Business Systems, Inc.*, slip op. at 13. Here, where the disclosure consisted of one sentence in a five-page document produced in conjunction with over one thousand pages of documents and where counsel took care to withhold all other allegedly privileged documents on the subject, I cannot state that there has been a waiver. Moreover, from the deposition testimony that I have reviewed, it is apparent that when SCB attempted to question Ayala on the "bullet-proof" agreement advice, Ayala immediately interposed the privilege, which lends credence to its claim of inadvertence and indicates proper attention to protection of the privilege. There is authority, furthermore, for the proposition that because the privilege belongs to the client rather

than his attorney, only the client can waive it. *See Connecticut Mutual Life Insurance Co. v. Shields*, 18 F.R.D. 448, 451 (S.D.N.Y.1955); 8 J. Wigmore, *supra*, § 2327 at 634–35. While I believe that particular proposition to be too extreme, it is clear that in the circumstances of the instant disclosure by Ayala's counsel, no waiver should be found.

## C. *Duress*

 In its memorandum submitted June 23, 1986, SCB for the first time appears to raise the claim that the attorney-client privilege has been waived as to the issue of duress pleaded by Ayala in its Fifth Affirmative Defense. I say "appears" because the claim is made merely off-handedly in a one-sentence footnote. In its subsequent letter of June 30, SCB has made a slightly longer argument on the issue. While I do not accept Ayala's contention that SCB has "waived" its right to raise the issue, I do not consider the issue appropriately presented for resolution at this time. First, since it was not previously raised, there is no ruling to "reconsider." Second, the issue has clearly not been adequately briefed. The basis for the claim of duress that Ayala makes in its one-sentence affirmative defense has not been explained so as to enable the court to even consider the question of waiver.[7] If SCB seriously wishes to pursue this claim, it should arrange for a pre-motion conference, as required by Civil Rule 3(*l*) of this court, at which the issue can be fleshed out.

## D. *Procedure*

 At the conference on June 11, counsel for SCB asked me to review *in camera* all documents (approximately 150) which Ayala was withholding on grounds of privilege. At that time I declined to do so for a number of reasons. First, I made certain general rulings pursuant to which

Ayala was directed to re-examine the documents and produce those which would not be found privileged under my rulings. I am informed that Ayala has now produced approximately one-third of the documents originally withheld. Second, the list of privileged documents Ayala had provided to SCB pursuant to Civil Rule 46 was inadequate in certain respects. Ayala was directed to provide a revised list to SCB. That has also now been done. SCB apparently again requests that I review each document *in camera*. Its counsel apparently believes that Ayala's counsel cannot be trusted to determine privilege. If this court were to review each and every document withheld as privileged in litigation in this courthouse, for no reason other than counsel's distrust of his adversary, this courthouse could hardly function. Ayala's counsel has an ethical duty as well as a duty under Fed.R.Civ.P. 11 to make a truthful, good-faith determination of what documents are privileged and to present a proper listing. The correct procedure at this point is for SCB to review Ayala's listing. It goes without saying that many documents involved in corporate acquisitions (such as communications concerning by-laws or employee benefit plans) may be obviously privileged and, furthermore, of no interest to SCB. A mere glance at the listing provided by Ayala confirms this. There is no need for the court to have to review such documents *in camera*. As to those documents for which SCB legitimately questions the privilege designation, it should specifically point them out to the court. As to those documents for which SCB's counsel believes Ayala's listing is still inadequate to enable a determination of whether any privilege is attached, SCB should request further information from Ayala's counsel or question Ayala's representatives as to the circumstances of the

---

7. Moreover, the only case cited by SCB is *Jack Winter, Inc. v. Koratron Co.*, 50 F.R.D. 225 (N.D. Cal.1970). I have already indicated the difficulty with that decision (*see* footnote 5, *supra* ). Further, given the time constraints within which reconsideration of my rulings was requested in aid of continuing depositions, I have had no opportunity to research independently this new issue.

documents' preparation and dissemination.[8] SCB may then bring to the attention of the court those documents as to which a question exists and request *in camera* review.[9]

SO ORDERED.

8. In this regard, I note that Ayala's description of the subject matters of the withheld documents does appear inadequate in many instances. I commend to the parties the listing set forth in the later *Koratron* opinion, 54 F.R.D. at 49–53, as an example of how proper descriptions may be set forth.

9. It does not appear from its submissions that SCB asks reconsideration of my rulings with respect to documents provided to Pettit & Mar-

tin by Price Waterhouse & Co. (other than those concerning the implied waiver issue dealt with herein). I assume, therefore, that in light of my rulings, no questions regarding the Price Waterhouse documents remain for resolution at this time. Production of such documents should be made forthwith in accordance with my rulings. *See also United States v. Kovel,* 296 F.2d 918 (2d Cir.1961).