Gordon E. ALLEN, John Currier, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Bruce E. Moore, Nicholas Pallotta and Cochran B. Supplee, Plaintiffs,

v.

WEST POINT–PEPPERELL INC., D. Michael Roark, C. Powers Dorsett and Barry F. Shea, Defendants.

No. 90 CIV 3841 (AGS).

United States District Court, S.D. New York.

March 11, 1994.

Robert J. Hausen, Chadbourne & Parke, New York City, for plaintiffs.

Francis Carling, Winthrop, Stimson, Putnam & Roberts, New York City, for defendants.

## OPINION AND ORDER

SCHWARTZ, District Judge:

### BACKGROUND

The facts underlying this action, and the related case of *Krumme v. West Point–Pepperell,* 89 Civ. 2016 are set forth in detail in *Allen v. West Point–Pepperell,* 945 F.2d 40 (2d Cir.1991). Some familiarity with them is presumed, but a brief summary follows.

The underlying lawsuit concerns the amount of lump-sum payments of plaintiffs' deferred compensation benefits under the Executive Permanent Insurance Program ("EPI Agreement") and an Amendment to the EPI Program dated November 11, 1988 (the "EPI Amendment") of West Point–Pepperell, Inc. ("West Point"). In mid-February 1989, a dispute arose over the discount rate to be used in calculating the present value of the EPI Program benefits. An EPI Program participant, Robert D. Krumme (the former general counsel to West Point–Pepperell) objected to the interest rate West Point intended to use in calculating the lump-sum payout to former employees, including Mr. Krumme and plaintiffs. Mr. Krumme stated in a letter to defendants dated February 21, 1989, that he had relied on an earlier value of the discount rate in his decision to sign the EPI Amendment.[1] At that point, all EPI participants were permitted to (1) rescind the EPI Amendment and return to the *status quo ante,* or (2) release West Point from all obligations under the EPI Agreement in exchange for the lump-sum payout.

Each of the plaintiffs in this action executed the release and received the lump-sum payout. Mr. Krumme, however, initiated a lawsuit against West Point alleging that West Point had fraudulently applied an incorrect discount rate. Discovery took place in *Krumme v. West Point–Pepperell,* 89 Civ. 2016 until August 31, 1989. Both sides moved for summary judgment in the fall of 1989; both motions were denied by Judge Conboy in an order dated April 19, 1990.

Plaintiffs commenced this action on June 6, 1990, alleging fraud. They seek, *inter alia,* to set aside the releases as fraudulently obtained. In the course of discovery in this case, defendants deposed Mr. Krumme on March 3, 1993. In that deposition, Mr. Krumme testified that, in August and September 1989, he telephoned at least 30 or 40 EPI participants, including plaintiffs. Deposition of Robert Krumme ("Krumme Dep.") 120–22, 148–49. He further asserted that he was retained as counsel by plaintiffs at that

---

1. The discount rate upon which Krumme claimed that he relied was 5%, *Allen,* 945 F.2d at 42, whereas West Point intended to calculate the present value of plaintiffs' EPI benefits based on a 9.3% discount rate. *Id,* at 43.

time to prosecute their claims arising under the EPI Agreement. Krumme Dep. 73–74, 121–22, 130.

### The Pending Motion

Presently before the Court is defendants' motion to compel discovery. Defendants seek to compel the production of documents and testimony relating to the aforementioned telephone conversations, as well as subsequent interactions between Mr. Krumme, plaintiffs in this action, and other contacted EPI Participants. Defendant's Mem. at 4–5. Both plaintiffs and Mr. Krumme have refused to answer questions on these matters, asserting the attorney-client privilege. Krumme Dep. 69, 73, 98, 123–24, 134–37; Defendants' Mem. at 5. In addition, Krumme has refused to disclose the identities of all but one of his EPI Participant clients (other than plaintiffs in this case), Krumme Dep. 124–37, while plaintiffs refuse to disclose the terms of plaintiffs' retainer agreements with Mr. Krumme—again plaintiffs assert the attorney client privilege. Krumme Dep. 158. Defendants respond that: (1) the attorney-client privilege should not apply to the conversations between Mr. Krumme and plaintiffs, Defendants' Mem. at 7–10; (2) if the attorney-client privilege does apply to the conversation, plaintiffs have waived its protection by placing the substance of the conversations "at issue" in this lawsuit, *id*, at 10–12;[2] and (3) the identities of Mr. Krumme's remaining EPI Participant clients and the contents of the retainer agreements between plaintiffs and Mr. Krumme are not privileged or confidential. *Id*, at 12–13. We address these arguments in turn.

### I. The Conversations

As noted, plaintiffs contend that the attorney-client privilege insulates from disclosure all conversations between plaintiffs and Krumme subsequent to his retention as counsel in August or September, 1989. By contrast, defendants argue that the privilege insulates no aspects of those conversations, and, even if we were to determine that the privilege did apply, substantial authority requires that we pierce its veil. We disagree with both formulations, although they derive from common misapprehensions of the nature and scope of the attorney-client privilege. As explained in detail below, we conclude that the privilege applies only to confidential communications made in the course of those conversations, and that defendants may explore non-privileged matters to an extent sufficient to assert their defense; therefore, the privilege need not be breached where it applies.

### Discussion

■ The attorney-client privilege is fundamental to the judicial process, constituting "the oldest of the privileges for confidential communications known to the common law. *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981), citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961). The critical purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Id*. The attorney-client privilege and all other evidentiary privileges, however, also impinge on the production of relevant evidence and thus function as obstacles to the fact-finder in the pursuit of the truth. Consequently, the Supreme Court has indicated that such evidentiary privileges should not be expansively construed. *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). Nevertheless, the attorney-client privilege serves a critical function in the operation of the law and the administration of justice and may not be disregarded lightly. *See, Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682. The Supreme Court has commanded that issues surrounding this privilege be examined on a painstaking, "case by case" basis. *Id*. at 396, 101 S.Ct. at 686. We proceed to such an examination.

■ The party asserting the privilege and resisting discovery, has the burden of establishing the existence of the privilege in

---

**2.** Specifically, defendants contend that lack of delay subsequent to discovering fraud is a necessary element of plaintiffs' rescission claim, De-fendants' Mem. at 11; *but see*, Plaintiffs' Mem. at 6. (asserting that lack of delay is element only of defendants' affirmative defense of laches).

all respects. *See, e.g., Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Von Bulow v. Von Bulow,* 811 F.2d 136, 144 (2d Cir.), cert. denied, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *Friedman v. Bache Halsey Stuart Shields, Inc.,* 738 F.2d 1336, 1341 (D.C.Cir. 1984). In order for the attorney-client privilege to attach, then, plaintiffs must demonstrate that [3]

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client, (b) without the presence of strangers, (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Davis,* 131 F.R.D. 391, 398 (S.D.N.Y.1990), citing *First Chicago Int'l v. United Exchange Co. Ltd.,* 125 F.R.D. 55, 56 (S.D.N.Y.1989); *see also, United States v. Bein,* 728 F.2d 107, 112 (2d Cir.1984) (similar formulation of factors); 8 J. Wigmore, Evidence § 2292 (McNaughton rev. 1961) (similar formulation of factors).

Several of the foregoing criteria are undisputed. Mr. Krumme is an attorney and was acting as a lawyer in his discussions with plaintiffs, Affidavit of Plaintiffs' Counsel Robert Hausen ("Hausen Aff.") at 1–2; the communications as to which the privilege is asserted occurred during, or subsequent to, the August or September conversations in which Mr. Krumme entered into an attorney client relationship with plaintiffs, *id.,* at 2–3; and Mr. Krumme and plaintiffs intended that the substance of their conversations remain confidential. *Id.,* at 3. The controversy centers on whether the communications between Krumme and plaintiffs were in fact confidential and whether plaintiffs waived the privilege. We address these issues below.

### 1. Confidentiality of the Communications

In his affidavit in opposition to the motion to compel discovery, plaintiffs' counsel cites the following passage from an affidavit of Mr. Krumme as evidence of the confidentiality of Mr. Krumme's discussions with plaintiffs:

> I was not going to prepare myself to discuss this with people without some sort of a structured attorney-client relationship because I wanted to protect what I was finding for my own benefit and for those who wanted representation in connection with this matter should I find that a fraudulent transaction occurred.

Affidavit of Hausen Aff. at 2, citing Affidavit of Robert Krumme, Exhibit A to Hausen Aff., at 101, 104, 114.

 This statement reveals that plaintiffs fundamentally misconceive the scope of the attorney-client privilege.

> [T]he protection of the privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Upjohn,* 449 U.S. at 395–96, 101 S.Ct. at 685–86 (quoting *Philadelphia v. Westinghouse Electric Corp.,* 205 F.Supp. 830, 831 (E.D.Pa. 1962)); *see also* 4 Moore's Federal Practice ¶ 26.60[2] at 26–193–94 (2d ed. 1984). Similarly, the privilege does not protect facts

---

**3.** As a threshold matter, the Court notes that New York law governs the question of attorney-client privilege in this case. Rule 501 of the Federal Rules of Evidence states:

> [I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government,

State, or political subdivision thereof shall be determined in accordance with State law.

Neither party disputes that the substantive law of New York governs this action; therefore, pursuant to Rule 501, New York law must also guide the Court's determination of the attorney-client privilege issue.

which an attorney obtains from independent sources and then conveys to his client. *See Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947); *Standard Chartered Bank PLC v. Ayala International Holdings ("SCB"),* 111 F.R.D. 76 (S.D.N.Y. 1986); 8 C. Wright and A. Miller, Federal Practice and Procedure § 2017 at 137 (1970); 8 J. Wigmore, *supra,* § 2317 at 619.[4]

■ Simply put, plaintiffs and Mr. Krumme must disclose to defendants all facts of which they were aware at all times relevant to this action, whether or not those facts were communicated by plaintiffs to Krumme and whether or not those facts were learned by plaintiffs from Krumme. *SCB,* 111 F.R.D. at 79. For example, plaintiffs must answer the following questions, drawn from the areas of inquiry identified in Defendants' Memorandum of Law at 6: When did you first learn facts that led you to believe that you were fraudulently induced to sign your release? What were those facts? When did you first learn of Krumme's suit? What specific information did you learn? When did you first learn of the Krumme summary judgment motion? When did you first learn the results of Krumme's motion and West Point's cross motion? These questions all probe plaintiffs' awareness of facts at certain times. "A party's knowledge of facts, from whatever source, is not privileged." *Id.* at 82.

■ The scope of plaintiff's duty to respond to defendants' inquiries, however, is not limitless. Defendants request, for example, the retainer agreements executed between Krumme and plaintiffs, Defendants' Mem. at 6, including information sheets filled

out by each plaintiff in order to provide Mr. Krumme and co-counsel with information for a potential lawsuit. Plaintiff's Reply Memorandum at 8. The confidentiality of the retainer agreements themselves is addressed *infra* at 17. The request for the information sheets, though, clearly violates the *Upjohn* prohibition against discovery regarding matter written by a client to his or her attorney. *See supra* at 6. As the Supreme Court explained in addressing similar questionnaires in *Upjohn,* however, "the Government was free to question the employees who communicated with Thomas and outside counsel" with respect to all facts contained in the privileged questionnaires. *Upjohn, supra,* 449 U.S. at 396, 101 S.Ct. at 686. Thus, while defendants may not obtain the information sheets themselves, they may explore in any manner consistent with this Order the factual underpinnings of those documents.[5]

The boundaries of the attorney client privilege under the facts at bar further crystallize when we confront, below, defendants' argument that plaintiffs waived the privilege.

### 2. Implied Waiver of the Privilege

■ Defendants urge the Court to mandate disclosure of the post-August/September conversations in their entirety, arguing that plaintiffs, by attacking the releases, placed the communications "at issue" in this action and thus waived the attorney-client privilege.

The species of implied waiver of the attorney-client privilege known as an "at issue" waiver has been the subject of extensive judicial treatment since its articulation in *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash. 1975).[6] This doctrine derives from tradition-

---

4. The work-product doctrine may protect certain factual information, but plaintiffs neither assert this privilege explicitly nor indicate that the information sought by defendants was "prepared in anticipation of litigation or for trial." Fed. R.Civ.P. 26(b)(3).

5. The Supreme Court acknowledged, and in fact required, the inefficiency of this circuitous route to the underlying factual information:

> While it would probably be more convenient for the Government to secure the results of petitioner's internal investigation by simply subpoenaing the questionnaires and notes taken by petitioner's attorneys, such considerations of convenience do not overcome the

policies served by the attorney-client privilege. As Justice Jackson noted in his concurring opinion in *Hickman v. Taylor,* 329 U.S., at 516, 67 S.Ct., at 396: "Discovery was hardly intended to enable a learned profession to perform its functions ... on wits borrowed from the adversary."

6. The court in *Hearn* prescribed that a court remove the protection of the attorney-client privilege only where 1) the privileged party puts his confidences at issue through an affirmative act, such as the filing of a complaint or the raising of an affirmative defense, 2) the assertion of the privilege results in manifest injustice to the opposing party and 3) the information sought is

al notions of waiver, and holds that by taking an action that places privileged information "at issue," a party may forfeit the privilege if truthful resolution of the action demands that the fact-finder examine the privileged information or the opposing party would be unfairly prejudiced by lack of access to the privileged information. *See Remington Arms Company v. Liberty Mutual Insurance Company*, 142 F.R.D. 408, 412 (D.Del. 1992) (historical review of doctrine of implied waiver or "at issue" waiver indicates that it has generally been held to apply where one party injects the contents of a privileged communication into the litigation and lack of dual access would unfairly prejudice the opposing party, or where truthful resolution of the issue would require disclosure of the information) (citing cases); *United States v. St. Pierre*, 132 F.2d 837, 840 (2d Cir.1942) (L. Hand), cert. dismissed as moot, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943) (selective use of privileged information by one side may "garble" the truth—in context of Fifth Amendment).

Expansive interpretation of "at issue" waiver under *Hearn* and its progeny has recently been the subject of significant legal and academic criticism. *See, e.g., Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 311–12 (N.D.Cal.1987) (stating that expansive language for determining implied waiver leads to ad hoc determinations that ignore the system-wide role of the attorney-client privilege and undermines the confidence that parties can place in that privilege); *Zenith Radio Corp. v. United States*, 764 F.2d 1577, 1580 (Fed.Cir.1985) (party does not waive privilege merely by bringing suit); Marcus, The Perils of the privilege: Waiver and the Litigator, 84 Mich.L.Rev. 1605 (1986) (liberal implied waiver rules increase litigation costs and judicial time spent on discovery disputes, favor the wealthiest litigants, and undermine the values served by the privilege rules); Developments–Privileged Communications, 98 Harv.L.Rev. 1450, 1637–43 (1985) (identifying the same policy concerns); *Remington Arms, supra*, at 142 F.R.D. 412–414 (noting inconsistency in courts' application of implied waiver tests

"vital" or "necessary" to the defense. *See id*, at

derived from *Hearn* due to competing policy concerns relating to the attorney-client privilege).

The tension among the foregoing policy considerations surrounding implied waiver of the privilege exists within this Circuit as well, where the boundaries of implied waiver have been the subject of conflicting opinion. Some courts have concluded that implied waiver should be limited to instances in which the elements of the *plaintiff's* case clearly implicate privileged information, as opposed to circumstances where, as here, a *defense* putatively requires breaching the privilege. *See, e.g., Chase Manhattan Bank N.A. v. Drysdale Securities Corp.*, 587 F.Supp. 57, 59 (S.D.N.Y.1984) ("It cannot be possible for [defendant] to justify breaching [plaintiff's] privilege by reason of its own pleading of an affirmative defense. That would give an adversary who is a skillful pleader the ability to render the privilege a nullity.") It has even been suggested that the *Hearn* balancing test be reserved for instances where the party holding the privilege explicitly bases its claim for relief or defense upon advice of counsel. *Connell v. Bernstien–Macaulay, Inc.*, 407 F.Supp. 420, 422 (S.D.N.Y.) ("The actual holding in [*Hearn*] is not in point because the party there asserting the privilege had expressly relied upon the advice of counsel as a defense to the plaintiff's action.")

Defendant understandably relies upon a line of cases in which courts have unhesitatingly applied a variation of the *Hearn* balancing test to facts similar to those before us. Defendant's Memorandum of Law at 10–13; *see, e.g., SCB*, 111 F.R.D. at 83 (to persuade the Court to find a waiver of the attorney-client privilege, moving party must prove that:

"(1) the very subject of privileged communications was critically relevant to the issue to be litigated; (2) there was a good faith basis for believing such essential privileged communications existed; and (3) there was no other source of direct proof on the issue.);

581.

*Davis,* 131 F.R.D. at 398–99 (same); *see also Greater Newburyport Clamshell Alliance v. Public Service Company,* 838 F.2d 13, 20 (1st Cir.1988) (the party seeking to pierce the privilege must show that the "evidence will be unavailable to [it] if the privilege prevails").

While mindful of the compelling policy arguments that underlie the various positions on "at issue" waivers that courts both within and without this Circuit have taken, we conclude that even under the liberal standard that defendants advocate, defendants have failed to sustain the "particularly high" burden they bear in demonstrating the need to breach the privilege. *Davis,* 131 F.R.D. at 398, citing *SCB,* 111 F.R.D. at 85.

Defendants argue that they satisfy the three-pronged test set forth in *SCB* as applied by Judge Conboy in *Davis.* We cannot agree. Defendants can show neither that the subject of the privileged communications is critically relevant to the issue of plaintiffs' delay in attacking the releases, nor that absent disclosure of the privileged communications there would be no other source of direct proof of laches.

Plaintiffs' confidential communications to their attorney, Krumme, and the legal advice rendered by Krumme are not necessary to a proper resolution of the unreasonable delay defense. The reasoning of Magistrate Judge Grubin in *SCB* provides guidance on this issue.

> What is relevant to the counterclaims here is not what counsel said to Ayala or Ayala said to counsel, but what Ayala knew or should reasonably have been expected to know prior to acquiring the Behring stock ... Nor is any legal advice rendered by Pettit & Martin to Ayala concerning acquisition of the Behring stock relevant to the issue of whether Ayala justifiably relied on the alleged oral representations of SCB

> ... I fail to see how any privileged legal opinion rendered by Pettit & Martin can bear upon the issue of whether Ayala actually did rely on SCB's statements and whether, as a matter of law, it was entitled to so rely based on all the facts known to it. Information on the former question can be obtained from Ayala, and the latter question is to be determined by the proceedings in this court, not by the opinion of Ayala's lawyers.

*Id,* at 82 (emphasis added).

Identical circumstances obtain in this action. Specifically, in adjudicating the laches issue the critical point is not what legal advice Krumme gave to plaintiffs or what plaintiffs said to Krumme, but rather what facts plaintiffs knew regarding the alleged fraud, when they became aware of those facts, and their state of mind at all relevant times. It is the province of this Court to determine whether, as a matter of law, the evidence on the foregoing matters mandates the conclusion that plaintiffs unreasonably delayed in attacking the release. Privileged communications between Krumme and plaintiffs need play no role in this process.[7]

■ Equally important, under the third prong of the *SCB/Davis* test, defendants here have alternatives to piercing the privilege in their discovery on the laches defense. Not unexpectedly, Judge Conboy and Magistrate Judge Grubin, in *Davis* and *SCB,* respectively, arrived at the same conclusion when presented with similar facts.

> If we assume for the sake of argument that [defendant] can show the first and second elements enumerated above, it nevertheless cannot show the third element as there is another direct source of proof on the issue: Mr. Pross himself ... [Defendant] has not shown that the information is otherwise unavailable, it has merely shown that it may be somewhat inconvenient to

---

**7.** We note, however, that the present irrelevance to the laches issue of Krumme's privileged legal advice is susceptible to change. For example, plaintiffs may indicate that they intend to respond to defendant's defense of unreasonable delay by asserting that they relied upon advice of counsel in waiting to attack the releases. Although we observe that the grounds for piercing the privilege would likely be more compelling

given such a development, *see Connell,* 407 F.Supp. at 422 ("The Court [in *Hearn*] therefore had no difficulty in concluding that such reliance upon the advice of counsel as a defense precluded any objection to inquiries concerning the circumstances under which the advice had been given and what the advice actually had been.") we decline to render an opinion on an issue that is not yet before us.

obtain the information it seeks. Accordingly, [defendant] has not met its burden of piercing the privilege ... *Davis*, 131 F.R.D. at 399.

To be sure, as in every lawsuit, it would be useful and convenient for SCB to obtain Ayala's privileged material, and the substance of its confidential communications with its attorneys might reveal some of what Ayala knew. But those are not reasons to void the attorney-client privilege. Ayala's privileged communications are not the only available means by which SCB can learn what Ayala knew. Plainly and simply, Ayala, if asked in discovery, must itself reveal what it knew ... SCB is not entitled to learn from Ayala what Ayala's lawyers told it concerning any need for a written agreement. *But SCB may ask what Ayala's belief or understanding was concerning the need for a written agreement, for Ayala is required to disclose its thoughts and knowledge, whether or not acquired from conversations with its attorneys. SCB*, 111 F.R.D. at 82.

As discussed in detail *supra* at 7–9, defendants here are entitled to inquire of plaintiffs and Mr. Krumme as to the facts of which they were aware at certain times prior to and during the pendency of this case and *Krumme v. West Point–Pepperell*, 89 Civ. 2016. To reiterate our finding at 8, a party's knowledge of facts, from whatever source and at whatever time they became known, is not privileged. *SCB*, 111 F.R.D. at 83. Nor, as the underlined portion of the above quotation indicates, is the state of mind of the plaintiffs. Thus, defendant may inquire as to plaintiff's belief or understanding as to the potential of this lawsuit, because plaintiffs must disclose their thoughts and knowledge regardless of whether or not they derived from conversations with Krumme.

▆▆ To be clear, plaintiffs and Mr. Krumme are required to disclose their knowledge of the facts as to all relevant times as well as their state of mind with respect to this lawsuit and *Krumme v. West-Point–Pepperell*, 89 Civ. 2016, but may not

be asked what they said to each other during the conversations in question. Nor, may defendants inquire as to the legal advice rendered by Mr. Krumme in those discussions.[8]

## II. The Terms of the Retainer Agreements

▆▆ We find that the retainer agreements between plaintiffs and Mr. Krumme, other than the information sheets, are not privileged. In this Circuit, fee arrangements are not privileged. *See, e.g., In re Shargel*, 742 F.2d 61, 62 (2d Cir.1984) ("[w]e have consistently held that ... fee information [is], absent special circumstances, not privileged"); *United States v. Golberger & Dubin, P.C.*, 935 F.2d 501, 504–507 (2d Cir.1991) (holding that the privilege does not protect client identity and fee information from an IRS subpoena). Plaintiffs offer no compelling reason to depart from this well-settled rule.

## III. The Identities of Mr. Krumme's Clients

▆▆ While defendants correctly point out that the identity and address of a client are not generally held to be confidential communications and, thus, not privileged, *see Matter of Jacqueline F.*, 47 N.Y.2d 215, 391 N.E.2d 967, 970, 417 N.Y.S.2d 884, 887; *In re Shargel*, 742 F.2d 61, 62 (2d Cir.1984), "the rule in New York is not so broad as to state categorically that the privilege never attaches to a client's identity"; *Matter of Jacqueline F.*, 47 N.Y.2d 215, 391 N.E.2d 967, 417 N.Y.S.2d 884, 887 (1979) (citing *Matter of Kaplan*, 8 N.Y.2d 214, 168 N.E.2d 660, 203 N.Y.S.2d 836, 838–39 (1960)) (refusing to hold lawyer in contempt for failure to disclose name of client because of client's justified fear of reprisals). The Court in *Matter of Jacqueline F.*, moreover, indicated that absent other compelling circumstances, a client's identity need not be disclosed where the client is not a party to the pending litigation. 417 N.Y.S.2d at 887. Defendants here have not made a showing of the need for disclosure of the names of Mr. Krumme's

---

8. Thus, we find objectionable such proposed questions by defendants, Defendant's Mem. at 6, as "Were you ever counselled to delay bringing

[this] suit until summary judgment motions in Krumme's action were decided?"

other clients sufficient to overcome the legitimate fear of retaliation harbored by those clients. *See* Hausen Aff. at 124, 126, 128 & 130–33.

## CONCLUSION

In light of the foregoing, defendants' motion to compel discovery is granted in part and denied in part. The parties are directed to resume discovery in a manner not inconsistent with this Order.

SO ORDERED.