Andrea T. LOFTIS, Individually and as Administratrix of the Estate of James LOFTIS, Plaintiff,

v.

AMICA MUTUAL INSURANCE COMPANY, Defendant.

No. 3:95 CV 1662(AHN).

United States District Court, D. Connecticut.

June 19, 1997.

Karen L. Murdoch, Horton, Shields & Cormier, Hartford, CT, for Plaintiff.

Francis H. Morrison, III, Day, Berry & Howard, Hartford, CT, for Defendant.

## RULING ON THE PLAINTIFF'S MOTION TO COMPEL

MARTINEZ, United States Magistrate Judge.

This is a bad faith action against an insurer for failing to settle an insurance claim. Presently pending before the court is a discovery dispute in which the court is called upon to decide whether the defendant must produce documents containing the confidential advice and work product of its attorney.[1] After oral arguments, supplemental briefs and an *in camera* review of the documents at issue, the plaintiff's motion to compel (doc. # 26) is GRANTED in part and DENIED in part.

### Factual Background

The following facts were obtained from the submissions of the parties in connection with the motion to compel.

---

1.  On April 12, 1996, the plaintiff moved to compel responses to several interrogatories and the production of certain documents. Since the filing of the plaintiff's motion, the parties have resolved by agreement many of the discovery disputes that were the subject of that motion. All that remains for the court to decide is whether Amica Mutual Insurance Company shall be compelled to produce any of four documents which have been withheld as protected under the attorney-client privilege and the work product doctrine. Those documents are (1) a letter from Noble K. Pierce, Esq. to Richard I. Hassett dated June 1, 1994, (2) a billing statement from Noble K. Pierce to Amica Mutual Insurance Company dated June 8, 1994, (3) a memorandum from Barbara Munsell to M. Stuart Towsay dated June 3, 1994, and (4) a document from Norman Norys to Barbara Munsell and M. Stuart Towsay dated June 3, 1994.

On October 25, 1993, James Loftis was killed in a head-on automobile collision when a car driven by Brian Whitlatch crossed over into Loftis's lane on Route 85 in Salem. Loftis, a 22 year old police dispatcher, left behind a wife and a small baby.

Brian Whitlatch was insured by the defendant Amica under a liability policy that provided coverage of $300,000 per claim. About a month after the fatal accident, an attorney representing Loftis's widow wrote to Amica and demanded that it settle with Mrs. Loftis for the $300,000 policy limit of Whitlatch's insurance. Mrs. Loftis's lawyer emphasized that Mrs. Loftis was unemployed, had an infant child to support and monthly mortgage payments to make. Mrs. Loftis's attorney also stressed the obvious liability of Amica's insured in causing the accident.

Over the next few months, Mrs. Loftis's lawyer communicated frequently with Amica. He repeated that Whitlatch's liability was clear and that Amica had had ample time to investigate the claim. Mrs. Loftis's lawyer extended several times the deadline by which Mrs. Loftis would accept payment of the $300,000 policy limit before filing suit. As early as mid-February of 1994, he raised the specter of suing Amica for its "bad faith" in failing to settle the claim quickly.

The parties dispute the details of the negotiations. Amica maintains that it offered the policy limits as soon as it concluded its investigation. The plaintiff claims that Amica lingered too long before finally trying to settle the claim for the police limits. In any event, the correspondence makes apparent that by March 14, 1994, Amica offered the $300,000 insurance policy with no conditions attached. It is also evident that by that time, Mrs. Loftis's attorney had informed Amica that Mrs. Lofts would no longer settle for that amount.

On April 19, 1994, Mrs. Andrea Loftis, acting in her individual capacity and as administratrix of her husband's estate, brought a wrongful death action against Brian Whitlatch in Connecticut Superior Court. Amica retained Attorney Thomas Mullaney to represent Whitlatch in the wrongful death action.

With one month of commencing the wrongful death action, Mrs. Loftis filed an offer of judgment for $325,000. Although there was no action pending directly against Amica at the time of the offer of judgment, Mrs. Loftis identified $25,000 of the offer of judgment as compensation to settle a claim against Amica for its "bad faith" in handling the insurance claim.[2] Attorney Mullaney, who represented Whitlatch, communicated the offer of judgment to Amica, but informed Amica that his ethical obligations to Whitlatch limited his ability to advise Amica concerning the offer of the judgment. Attorney Mullaney therefore suggested that Amica consult independent counsel.

Amica then forwarded the Whitlatch claim file to the law firm of Howard, Kohn, Sprague and Fitzgerald with a cover letter stating that Amica wanted "a legal opinion as to whether or not Pierce responded to Amica's request by letter dated June 1, 1994. The letter contained Attorney Pierce's legal opinion regarding Amica's exposure to a bad faith claim based upon his review of the faces contained in the claims file which Amica provided to him. Thereafter, Amica rejected the offer of judgment.

In May 1995, the wrongful death action was tried before a jury in the Connecticut Superior Court in New London. The jury found in favor of the plaintiff and awarded the estate damages in the amount of $3,585,303 and also awarded Mrs. Loftis damages in the amount of $152,000.

Having obtained judgment against Amica's insured, Mrs. Loftis, acting in her individual capacity and on behalf of her husband's estate, brings this action against Amica pursuant to Connecticut General Statutes § 38a–321 for payment of the judgment against Brian Whitlatch.

In this action, the plaintiff alleges that Amica acted in bad faith by *inter alia*, failing to attempt to effectuate a Prompt, fair and equitable settlement of the plaintiff's claims

---

2. Under Connecticut law, when an insurer unreasonably and in bad faith withholds payment of a claim, it may be subject to liability in tort.

*Grand Sheet Metal Products Co. v. Protection Mutual Ins. Co.*, 34 Conn.Supp. 46, 50–51, 375 A.2d 428 (1977).

after the liability of its insured had become apparent and by failing to accept an offer to settle the plaintiff's claims against its insured for the limits of the insured's policy. The plaintiff further alleges that Amica's failure to accept the offer of judgment for $325,000 also constituted bad faith.

## Discussion

The plaintiff moves to compel the production of four documents which Amica has withheld as protected under the attorney-client privilege and the work product doctrine. The documents at issue are the letter from Amica's outside counsel to Amica which sets forth the attorney's legal opinion and advice to Amica, a billing statement from Amica's outside counsel to Amica, and two internal memoranda between Amica employees which discuss the outside counsel's legal opinion and advice. The court will separately discuss the scope of the protections afforded by the attorney-client privilege and the work product doctrine as applied to the documents at issue in this case.

## I.  Attorney-Client Privilege

■ Connecticut law defines and governs the application of the attorney-client privilege in this diversity action. *Dixon v. 80 Pine St. Corp.*, 516 F.2d 1278, 1280 (2d Cir. 1975) (federal courts sitting in diversity look to state law regarding the attorney-client privilege); Rule 501, Fed.R.Evid.

■ Connecticut has adopted the common law formulation of the attorney-client privilege which states that "[w]here legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived." *Rienzo v, Santangelo*, 160 Conn. 391, 395, 279 A.2d 565 (1971). The party asserting the attorney-client privilege bears the burden of establishing all of the elements of the privilege. *State v. Hanna*, 150 Conn. 457, 466, 191 A.2d 124 (1963).

## A.  *Attorney Pierce's June 1, 1994 Letter*

■ The first document that is the subject of the plaintiff's motion to compel is the June 1, 1994 letter written by Attorney Pierce to Amica. Based upon the parties' submissions and an *in camera* review of the letter, the court finds that Attorney Pierce's letter satisfies many but not all of the elements necessary to merit protection under the privilege. The letter was written by Attorney Pierce in his capacity as Amica's attorney. It contains Attorney Pierce's advice and opinions and was written in response to Amica's request for legal advice. In addition, the contents of the letter were communicated in confidence to Amica and that confidentiality has apparently been maintained. The letter, however, fails to satisfy that element of the privilege which requires that the protected communication be a confidence of the client.

After a careful review of the record, the court finds that any communications made by Amica which are revealed in (or which may be inferred from) Attorney Pierce's letter have already been disclosed. To begin with, Amica's request for Attorney Pierce's legal opinion as been disclosed. In that request, Amica said that it was enclosing the claims file. The claims file has been disclosed. Attorney Pierce attests that the facts contained in his opinion letter were communicated to him through Amica's claims file. *See* Exhibit A to Defendant Amica Mutual Insurance Company's Supplemental Memorandum of Law in Opposition to Plaintiff's Motion to Compel dated April 18, 1997. Thus, any communications made by Amica when it sought the advice of its attorney—even if confidential when made—have since been disclose as part of the normal course of this litigation and are no longer confidential.

The question presented by the motion to compel Attorney Pierce's letter, therefore, is whether the attorney-client privilege protects from disclosure the legal opinion and advice communicated in confidence by an attorney to his client where that opinion and advice do not reveal client confidences. Amica argues that the letter should be protected because it contains the advice of Amica's attorney. The plaintiff argues that the letter should be disclosed if it does not reveal any confidential

communications by the client. Because the Connecticut Supreme Court has not decided this issue, this court must predict how Connecticut's highest court would rule under the circumstances of this case. *See Doyle v. St. Paul Fire & Marine Ins. Co., Inc.,* 583 F.Supp. 554, 555 (D.Conn.1984) (when deciding issue not yet decided by the highest court of the state, federal court sitting in diversity may consider all data the highest court would use to determine how the Connecticut court would decide).

The law in other jurisdictions is not uniform as to whether the attorney-client privilege protects a lawyer's advice that does not reveal a client's confidence. Applying a broad approach to the privilege, some courts have held that the privilege protects communications from the lawyer, regardless of whether he lawyer's communications reveal confidences from the client. *See e.g. United States v. Amerada Hess Corp.,* 619 F.2d 980, 986 (3d Cir.1980); *In re LTV Securities Litigation,* 89 F.R.D. 595, 602–03 (N.D.Tex. 1981).

Many other courts, however, have rejected the broad approach to the privilege, opting instead to apply the privilege narrowly. *See* Scott N. Stone and Robert K. Taylor, *Testimonial Privileges,* § 1.25 (2d ed.1995). These courts hold that the attorney's communications are not privileged unless they reveal client confidences. *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 522 (D.Conn.) (Newman, J.), *appeal dismissed,* 534 F.2d 1031 (2d Cir.1976). As Judge Newman reasoned in *SCM Corp. v. Xerox Corp.,* "[u]nless the legal advice reveals what the client has said, no legitimate interest of the client is impaired by disclosing the advice." *Id.See also In re Sealed Case,* 737 F.2d 94 (D.C.Cir.1984) (communications from attorney are privileged where they are based in significant and inseparable part on confidential communications from the client); *Schlefer v. United States,* 702 F.2d 233, 245 (D.C.Cir.1983) (lawyer-client privilege protects communications from attorney to client when confidential and based on confidential information supplied by client) *Walsh v. Northrop Grumman Corp.,* 165 F.R.D. 16, 18 (E.D.N.Y.1996) (second circuit "remains committed to the narrowest

application of the privilege such that it protects only legal advice that discloses confidential information given to the lawyer by the client"); *Montgomery v. Leftwich, Moore & Douglas,* 161 F.R.D. 224, 226 (D.D.C.1995) (communications made by attorney to client are shielded only if they rest on confidential information obtained from the client); *Republican Party v. Martin,* 136 F.R.D. 421, 426 (E.D.N.C.1991) (the privilege does not apply to legal advice which does not reveal client confidences); *In re Tire Workers Asbestos Litigation,* 125 F.R.D. 617, 621–22 (E.D.Pa.1989) (under Pennsylvania law, attorney's speech at union meeting outlining possible rights or union members was not privileged because speech was not based on client confidences); *Potts v. Allis–Chalmers Corp.,* 118 F.R.D. 597, 602–05 (N.D.Ind.1987) (attorney required to reveal legal advice where no showing had been made that advice would disclose client confidences).

Amica argues that an attorney's advice is protected under Connecticut law and cites the Connecticut Supreme Court decision in *Ullmann v. State,* 230 Conn. 698, 647 A.2d 324 (1994) in support of its argument. Amica reads *Ullmann* too broadly. The issues in *Ullmann* arose out of a criminal trial involving charges of witness tampering. *Id.* at 699, 647 A.2d 324. At the trial, the state sought to establish that the attorney for the accused had communicated the witness's telephone number to the accused. *Id.* at 714, 647 A.2d 324. The state attempted to compel the accused's attorney to testify as to certain facts, including whether the attorney knew the telephone number of the witness at the time that he met with his client. *Id.* at 700–01, 647 A.2d 324. When the attorney refused to answer the state's questions on the ground that the information sought was protected from disclosure by the attorney-client privilege, the court held the attorney in criminal contempt and fined him $100. *Id.* at 702, 647 A.2d 324. Reviewing the trial court's ruling, the Connecticut Supreme Court found no error. *Id.* at 724, 647 A.2d 324. Recognizing that the attorney-client privilege does not protect all communications from an attorney to is client, the *Ullmann* court stated that a "communication from attorney to client solely regarding a matter of fact would not ordi-

narily be privileged, unless it were shown to be inextricably linked to the giving of legal advice." *Id.* at 713, 647 A.2d 324. The court concluded that the communications at issue in *Ullmann* were not made by the attorney in connection with giving legal advice and held that the attorney-client privilege was not implicated. *Id.* at 714, 647 A.2d 324. The court did not address the issue which is presented by this case, that is whether advice is protected if it does not reveal client confidences.

Amica draws this court's attention to the statement in *Ullmann* that "[t]he attorney-client privilege protects communications between client and attorney when made in confidence for the purpose of seeking or giving legal advice." *Id.* at 711, 647 A.2d 324. In light of the facts and holding of *Ullmann,* this statement should not be read to mean that the Connecticut Supreme Court has adopted the broad view of the attorney-client privilege which shields all legal advice from disclosure. To the contrary, the Connecticut Supreme Court was merely stating what was not in contention. *Ullmann* does not hold that legal advice itself is protected all instances. Indeed, the *Ullmann* court stated that the attorney-client privilege is to be "strictly construed because it tends to prevent a full disclosure of the truth in court." *Ullmann v. State,* 230 Conn. 698, 711, 647 A.2d 324 (1994). *See also Turner's Appeal,* 72 Conn. 305, 318, 44 A. 310 (1899).

■ This court believes that the Connecticut Supreme Court would adopt the reasoning of Judge Newman and join those courts, including the federal courts of the second circuit, which apply the privilege narrowly to hold that an attorney's communications with the client are not privileged unless they reveal client confidences. Because there has been no showing by Amica that Attorney Pierce's letter reveals any client confidences, the court holds that the June 1, 1994 letter is not protected by the attorney-client privilege.

### B. *Billing Statement from Amica's Outside Counsel*

■ Billing statements from an attorney to a client which do not reveal a client's confidential communications are not protected by the attorney-client privilege. *Rehim v. Kimberly–Clark Corp.,* No. 323416, 1996 WL 727338 (Conn.Super., Dec. 5, 1996). The court finds that, like the June 1, 1994 letter, the June 8, 1994 billing statement does not reveal any client confidences. That billing statement is therefore not protected by the privilege.

### C. *Amica's Internal Correspondence Regarding Attorney's Advice*

■ The advice which Amica received from Attorney Pierce is discussed in two internal documents generated by Amica employees. The only ground on which Amica claims these documents are privileged is that they reveal the substance of Amica's attorney's advice. However, because this court holds that the attorney's advice is not privileged, it follows that the internal memoranda discussing that advice also are not privileged. The court holds that the internal memoranda are not protected by the attorney-client privilege.

### II. *Work Product Doctrine*

Having concluded that the attorney-client privilege does not protect the documents at issue from disclosure, the court now turns to the question of whether the documents are protected under the work product doctrine.

The work product doctrine shields from disclosure documents and other materials prepared in anticipation of litigation or trial by a party or a party's representative, absent a showing of substantial need. Fed.R.Civ.P. 26(b)(3); *see also In re Grand Jury Subpoenas,* 959 F.2d 1158, 1166 (2d Cir.1992). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area in which he can analyze and prepare his client's case." *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). By establishing a zone of privacy for strategic litigation planning, the work product doctrine prevents one party from piggybacking on the adversary's preparation. *United States v. Adlman,* 68 F.3d 1495, 1501 (2d Cir.1995).

■ First articulated by the United States Supreme Court more than 50 years ago in

*Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the work product doctrine has since been substantially incorporated in Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides, in pertinent part:

a party may obtain discovery of documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Federal law governs the protection afforded under the work product doctrine in federal courts. *EDO Corp. v. Newark Insurance Co.,* 145 F.R.D. 18, 21 (D.Conn.1992).

■ The degree of protection afforded under the work product doctrine is dependent upon whether the work product *is ordinary or opinion* work product. In either event, the protection is not absolute. A party can obtain discovery of ordinary work product materials by demonstrating substantial need and the inability to obtain the substantial equivalent of the materials without undue hardship. Fed.R.Civ.P. 26(b)(3). Opinion work product, which reflects the mental impressions, conclusions or opinions of an attorney, receives greater protection. *Id.* Disclosure of opinion work product is particularly disfavored by the courts and requires a far stronger showing of necessity and unavailability by other means. *Upjohn Co. v. United States,* 449 U.S. 383, 401–02, 101 S.Ct. 677, 688–89, 66 L.Ed.2d 584 (1981); *see also S.N. Phelps & Co. v. Circle K. Corp.,* No. 96 CV 5801(JFK), 1997 WL 31197, at *7 (S.D.N.Y. 1997) (party seeking discovery of opinion

work product must demonstrate "extraordinary justification" citation omitted)).

■ As the party invoking the protection of the work product doctrine, Amica has the burden of establishing that the documents at issue were prepared in anticipation of litigation. *Helt v. Metropolitan District Commission,* 113 F.R.D. 7, 12 (D.Conn.1986). The burden of proving that the need for the documents overrides the protection of the work product doctrine rests with the plaintiff. *Id.*

### A. *Attorney Pierce's June 1, 1994 Letter*

The defendant has argued, and the plaintiff has conceded, that Attorney Pierce's June 1, 1994 letter constitutes opinion work product. The letter is therefore deserving of the highest protection under the work product doctrine. In order to decide whether Attorney Pierce's letter should be produced, this court must evaluate whether the plaintiff's need for the letter in the context of this action is so compelling as to warrant production of the letter and revelation of Attorney Pierce's opinion work product. The court finds that it is not so compelling.

■ In a bad faith action against an insurer, the plaintiff must show that the insurer was unreasonable in withholding payment of the claim of its insured. *See L.F. Pace & Sons. Inc. v. Travelers Indemnity Co.,* 9 Conn.App. 30, 46, 514 A.2d 766, *cert. denied* 201 Conn. 811, 516 A.2d 886 (1986). "Bad faith actions against an insurer ... by their very nature 'can only be proved by showing exactly how the company processed the claim, how thoroughly it was considered and why the company took the action that it did.'" *Robarge v. Patriot General Insurance Company,* 42 Conn.Supp. 164, 166–67, 608 A.2d 722 (1992) (quoting *Brown v. Superior Court In & For Maricopa County,* 137 Ariz. 327, 336, 670 P.2d 725 (1983)). To establish that the insurer acted in bad faith, the plaintiff "must show 'whether [the insurer] sought and followed [the] advice and recommendation of its agents, adjusters and attorneys.' Therefore, all such information is relevant and good cause [is] established for its production." *Id.,* quoting *Chitty v. State*

*Farm Mutual Automobile Ins. Co.*, 36 F.R.D. 37, 40 (E.D.S.C.1964).[3]

■ In this case, the focus of the plaintiff's claims of bad faith is upon Amica's failure to promptly settle the insurance claim for the limits of the policy as soon as the liability of its insured became apparent. Indeed, It was Amica's delay in offering the policy limits that first prompted Mrs. Loftis to increase her demand to $325,000 when she filed the offer of judgment.

The plaintiff also claims that Amica's failure to accept the $325,000 offer of judgment constituted bad faith. The plaintiff does not argue, as she cannot, that Amica's failure to pay the $25,000 above the policy limits in and of itself constituted bad faith. As the defendant points our, "[i]t is axiomatic that no insurer is bound to provide indemnification ... beyond the scope of the coverage described in the insurance contract, the policy." *Plasticrete Corporation v. American Policyholders Ins. Co.*, 184 Conn. 231, 235–36, 439 A.2d 968 (1981). Rather, the plaintiff maintains that Amica failed to inform its insured of the offer and failed to give the insured the option to personally pay the $25,000 above policy limits to avoid the risk of a huge judgment against him. *See* Third Amended Complaint, All Counts, ¶ 17n and Plaintiff's Reply to Defendant's Objection to Motion to Compel dated May 28, 1996 at pp. 5–6.

After careful review of the plaintiff's claims and arguments and the factual context out of which they arise, the court concludes that the plaintiff has not established substantial need for the opinion work product of Attorney Pierce. Attorney Pierce's advice was sought so that Amica might better assess its bad faith exposure based upon its handling of the insurance claim. Evidence of the manner in which Amica processed or handled the claim up to the point when Amica sought Attorney Pierce's opinion has been made available to the plaintiff. Negotiations

regarding settling the insurance claim for the policy limits had ended by the time Attorney Pierce's advice was sought. Attorney Pierce's after-the-fact assessment of his client's handling of the claim is not necessary for the plaintiff to prepare her claim that Amica had acted in bad faith in failing to effectuate a prompt settlement for the policy limits.

Nor is Attorney Pierce's opinion letter necessary to the plaintiff's claim that Amica acted in bad faith by rejecting the $325,000 offer of judgment without informing its insured of the offer and giving him the opportunity to contribute toward a settlement. Whether Amica was obligated to inform its insured of the offer or to permit him the opportunity to pay the $25,000 in excess of the policy limits was not discussed by Attorney Pierce in his opinion letter to Amica. Therefore, disclosure of Attorney Pierce's opinion letter cannot be necessary to that aspect of the plaintiff's case.

In sum, based upon the plaintiff's claim and based upon the court's *in camera* review of Attorney Pierce's letter, the court concludes that the plaintiff has not demonstrated the requisite need for Attorney Pierce's opinion work product. The letter therefore should be protected.

### B. *Billing Statement from Amica's Outside Counsel*

■ The billing statement from Amica's outside counsel to Amica contains general descriptions of the work which Amica's outside counsel performed in response to Amica's request. The billing statement does not reveal any ordinary or opinion work product of Attorney Pierce and, therefore, should be disclosed.

### C. *Amica's Internal Correspondence Regarding Attorney's Advice*

■ The two pieces of internal correspondence between Amica employees contain

---

**3.** The plaintiff relies upon a line of cases, including *Chitty v. State Farm Mutual Automobile Ins. Co.*, 36 F.R.D. 37 (E.D.S.C.1964) and *Bourget v. Government Employees Ins. Co.*, 48 F.R.D. 29, 33 (D.Conn.1969), in arguing that Attorney Pierce's opinion must be disclosed. However, the issue presented in *Chitty* and *Bourget* concerned whether the insurer was compelled to produce

correspondence between it and the attorney it retained to represent the insured. These cases are inapposite to the issue presented in this case because Attorney Pierce did not represent the insured. The plaintiff's suggestions to the contrary notwithstanding, the record in this case makes clear that Attorney Pierce represented Amica, not the insured.

references to Attorney Pierce's work product. To the extent that the correspondence reveals Attorney Pierce's work product, the correspondence should be redacted so that that work product is not revealed.

With respect to the correspondence from Barbara Munsell to M. Stuart Towsay dated June 3, 1994, the document should be redacted as follows:

The first three sentences in the second paragraph should be redacted because they reveal the substance of Attorney Pierce's analysis. That remainder of the second paragraph, beginning with "He has no understanding . . . ." should be produced.

The first sentence of the third paragraph should be redacted because it reveals the substance of Attorney Pierce's work product. The second sentence of the third paragraph should be produced up to and including the phrase "$25K in Calif." The last four words of the second sentence should be redacted. The remainder of the third paragraph should be produced.

Other than those portions of the memorandum designated to be redacted as set forth above, the remainder of the memorandum reveals the opinions of the Amica employees who wrote the document and is therefore discoverable.

With respect to the correspondence from Norman Norys Barbara Nunsell and M. Stuart Towsay dated June 3, 1994, the document should be redacted as follows:

Excepting the handwritten initials that appear at the bottom left side of the page, the handwritten notation at the bottom of the page which appears below the typewritten statement "please call (203) 659–4151" should be redacted because it reveals the work product of Attorney Pierce. The remainder of the document should be disclosed.

### Conclusion

For the above stated reasons, the plaintiffs' motion to compel (doc. # 26) is DENIED as moot insofar as the parties have been able to reach agreement on the matters previously in dispute. The motion is DENIED with respect to the correspondence from Noble K. Pierce, Esq. to Richard W.

Hassett dated June 1, 1994. The motion is GRANTED in part and DENIED in part with respect to the correspondence from Barbara Munsell to M. Stuart Towsay dated June 3, 1994, and the correspondence from Norman Norys to Barbara Munseil and M. Stuart Towsay dated June 3, 1994, both of which are to be produced with redactions as set forth in this decision.

SO ORDERED.