Charles **THURMOND** and Hal **Lapray, Tracy D. Wilson, Alisha Seal Owens, on behalf of themselves, and all others similarly situated, Plaintiffs,**

v.

**COMPAQ COMPUTER CORPORATION, Defendant.**

No. 1:99CV711.

United States District Court, E.D. Texas, Beaumont Division.

Oct. 18, 2000.

---

David J. Beck, Alistar Dawson, Beck Redden & Secrest, Houston, TX, for defendant.

## MEMORANDUM OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATIONS OF THE SPECIAL MASTER

RADFORD, United States Magistrate Judge.

Representative Plaintiffs filed a class action suit against the Defendant, Compaq Computer Corporation in October, 1999. Thus, began a hard-fought paper war that has subsided for the most part. This opinion addresses one of the more distasteful incidents arising during that conflict.

Long ago, Plaintiffs attempted to notice the deposition of Compaq employees, including Lewis Newcomb, the manager of an engineering group in the Houston office. Since the Defendant had filed a motion to quash certain 30(b)(6) depositions, Plaintiff issued a subpoena for Mr. Newcomb's deposition, and engaged a process server.

In an affidavit attached to a Motion for Sanctions,[1] the process server detailed how, over a period of ten days, he attempted to deliver the subpoena at the home of the deponent and the offices of the Defendant, and, despite telephonic agreement with the deponent to collect the subpoena by meeting the server at a security checkpoint, service failed.[2]

The Court held a hearing on June 26, 2000 on the Motion for Sanctions (and many, many others,) and ordered the deposition of Mr. Newcomb be taken no later that July 11, 2000.[3] Following the deposition, Plaintiff supplemented the Motion for Sanctions claiming that the deponent had invoked privilege on matters that were not privileged, and had failed to answer many questions in a truthful, straightforward, and meaningful way.[4]

Gary N. Reger, Orgain Bell & Tucker, Beaumont, TX, for plaintiff.

1. Exhibit A, Second Supplement to Motion for Sanctions [260].

2. The record reflects that the deponent was home when the process server arrived at his home, and that he bravely sent his wife to the door to deal with the strange man waiting there.

3. The original notice date was July 10, 2000, and ultimately, the deposition was taken on that date.

4. Mr. Newcomb's responses reinforced the Court's previous conclusion that he actively had evaded service. Two typical examples from the first deposition are:

On review of the deposition and the submissions of the parties, the Court agreed that Mr. Newcomb was evasive in the extreme, and was of the opinion that he might have earned a holiday in the custody of the federal correctional facility in Jefferson County. To assist the Court in making such a determination, Associate Dean Steven J. Goode of the University of Texas School of Law[5] was appointed a special master, and instructed to oversee a second deposition of Mr. Newcomb with an eye towards identifying whether the privileges asserted by the deponent[6] were justified, or merely designed to frustrate the Plaintiff and the Court in resolving this suit.[7]

Following the second deposition, the special master submitted his report and recommendation. There having been no objections filed, and the Court having reviewed the findings and conclusions of the special master, now **ADOPTS** the report of the special master and his recommendations, including his findings of facts and conclusions of law.

Therefore, the Court **AFFIRMS–IN–PART** and **OVERRULES–IN–PART** those privileges asserted by the deponent, consistent with the extent of the asserted privileges as determined by the special master in his recommendations. Thus, Mr. Newcomb is **ORDERED** to answer questions for which privilege has been overruled if a third deposition is requested by the Plaintiffs.

It is further **ORDERED** that the parties, at their option and cost, may retain the services of the special master during the term of a third deposition, whether in person or via telephonic means, for the purpose of ruling on and resolving any disputed claim of privilege that might be asserted at that deposition.

Any rulings made by the special master at such a deposition shall be immediately binding on the parties and the deponent as if made by the undersigned.

### REPORT AND RECOMMENDATIONS OF SPECIAL MASTER

GOODE, Special Master.

Pursuant to this Court's order of August 29, 2000, I submit this Report and Recommendations.

### I. Introduction

Plaintiffs took the second deposition of Lewis Newcomb on September 12, 2000. Following the deposition, plaintiffs narrowed the issues upon which they seek rulings from this Court to the items enumerated in their letter of September 19, 2000. All concern defendant's assertions of privilege in Mr. Newcomb's first and second depositions. There exists a substantial overlap in the areas covered in these two depositions and in the questions that provoked privilege assertions. But plaintiffs did not explore in the second deposition every area that was the subject of a privilege claim in the first deposition. Defendant contends that plaintiffs thereby waived their right to seek rulings as to those areas left unexplored at the second deposition. It argues that plaintiffs are entitled to seek rulings only with respect to privilege assertions made in the second deposition.

No such limitation appears in the order appointing the special master, and I recommend that this Court find that plaintiffs are entitled to seek a ruling on defendant's privilege assertions in the first deposition even with respect to those areas that plaintiffs chose not to revisit the issue in the second deposition. Defendant contends that no plausible reason existed to redepose Mr.

---

Q: Why did you buy a refrigerator if it wasn't to cool something? What other purpose would you use a refrigerator for that most of us wouldn't?
A: I can't answer that. Page 12, ll. 10–13.
Q: Sir, are American consumers entitled to get what they pay for?
A: I can't answer that question.
Q: You don't have an opinion on that one way or the other?
A: I don't give opinions. Page 9, ll. 13–18.

---

**5.** Fulbright & Jaworski Professor of Law. Dean Goode teaches Texas & federal evidence and has authored several books on evidence including "Courtroom Handbook on Federal Evidence." West, 2000.

**6.** At both depositions.

**7.** Appointment Order[269] dated August 29, 2000.

Newcomb on September 12th if plaintiffs could later raise issues from the first deposition and force yet another deposition. This argument, however, proves too much. Defendant's privilege assertions at the second deposition were not resolved at that deposition. Thus, the prospect that a third deposition may be required exists independent of the plaintiffs' decision to forego revisiting certain lines of inquiry in the second deposition. This is particularly true in light of three factors: time pressures that surrounded the taking of the second deposition (partially because the court reporter arrived more than an hour late); the number of privilege objections made in the first deposition; and Mr. Newcomb's lack of responsiveness in the first deposition, which severely hampered the efforts of plaintiffs' counsel to cover a reasonable amount of material in the first deposition.

With one exception, the defendant's privilege claims in the first deposition were grounded on the attorney-client privilege and work product; in the second deposition, defendant relied solely on the attorney-client privilege. Plaintiffs claim that defendant failed to timely assert work product during the first deposition. I recommend, however, that this Court find that defendant timely asserted work-product protection. Defendant clearly articulated that it was relying on both work product and the attorney-client privilege, even if Mr. Newcomb employed a layperson's shorthand in referring to privilege. *See* Newcomb Dep. I–57–58; 112–113.

II. The Attorney–Client Privilege

■ The attorney-client privilege is designed "to encourage clients to make full disclosure to their attorneys." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1576, 48 L.Ed.2d 39 (1976). But since "the privilege stands in derogation of the public's 'right to every man's evidence,' 8 Wigmore (McNaughton rev. ed.1961) § 2192 at 70, and as 'an obstacle to the investigation of the truth,' id., § 2291 at 554; * * * as Wigmore has said, 'It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *United States v. Pipkins*, 528 F.2d 559, 562–

63 (5th Cir.1976), cert. denied, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976), quoting *In re Horowitz*, 482 F.2d 72, 81 (2d Cir.1973), cert. denied, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973). *See also In re Grand Jury Proceedings in Matter of Fine*, 641 F.2d 199, 204 (5th Cir.1981) ("the attorney-client privilege should be confined within the narrowest limits consistent with its purpose").

■ Not everything communicated between a client and a lawyer falls within the attorney-client privilege. The Fifth Circuit follows the oft-quoted test first set forth in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass.1950):

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.1978), cert. denied, 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978); *In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir.1975).

■ Plaintiffs urge that they are seeking to discover facts, not attorney-client communications. Since the privilege protects only communications, and not the underlying facts, they argue that this Court should reject defendant's privilege claims. It is indeed hornbook law that the privilege protects communications, not facts. C. Mueller & L. Kirkpatrick, Evidence § 5.12 (2d ed.1999). Thus, while it is not proper to ask, "What did you tell your lawyer about the accident," it is quite proper to ask, "What do you know about the accident?" A client cannot insulate the underlying facts from discovery simply by relating them to counsel.

As Defendant correctly points out, however, the issue here is not that simple. This is not an instance in which Mr. Newcomb is asserting the privilege as to facts that he knows and that he also happened to relate to counsel. Rather, defendant's claim is that the privilege applies because Mr. Newcomb only learned the facts through communications with counsel. Thus, he is not trying to insulate facts from discovery by relating them to counsel; he is refusing to disclose information communicated to him by counsel.

This does not, however, conclude the issue. By its terms, the attorney-client privilege applies only to communications from the client to the lawyer. *See* requirements 2(a) and (3)(a) in the *United Shoe Machinery Corp.* test quoted above. The communications in issue here went in the opposite direction—from lawyer to client. Compounding the problem is that plaintiffs did not ask Mr. Newcomb, "did your lawyer tell you X" or seek to discover documents addressed from counsel to Mr. Newcomb. Instead, plaintiffs asked Mr. Newcomb—without regard to the source of his knowledge,—"Did you know X," and Mr. Newcomb volunteered that if he knew X it was only because his lawyers told him X.

The issue thus becomes to what extent does the privilege cover communications by a lawyer to a client. Although the courts all agree that some lawyer-to-client communications are protected, just how broad the protection extends is a matter of great controversy. The narrowest view is that the attorney-client privilege reaches only those lawyer-to-client communications that would reveal confidential client-to-lawyer communications. *E.g., Loftis v. Amica Mutual Ins. Co.*, 175 F.R.D. 5, 10 (D.Conn.1997); *Republican Party v. Martin*, 136 F.R.D. 421, 426 (E.D.N.C.1991); *Potts v. Allis–Chalmers Corp.*, 118 F.R.D. 597, 602–05 (N.D.Ind. 1987); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 522 (D.Conn.1976), appeal dismissed, 534 F.2d 1031 (2d Cir.1976).

Other courts take a somewhat broader view: The privilege reaches lawyer-to-client communications so long as they are based on confidential information provided by the client. *E.g., In re Sealed Case*, 737 F.2d 94, 99 (D.C.Cir.1984); *Schlefer v. United States*, 702 F.2d 233, 245 (D.C.Cir.1983); *Mead Data Central, Inc. v. United States Dept. of Air Force*, 566 F.2d 242, 254 (D.C.Cir.1977). Under this view, lawyer-to-client communications based on information obtained by the lawyer from other sources are not privileged. *In re Sealed Case*, 737 F.2d at 99.

Still other courts are willing to protect both lawyer-to-client communications that would tend to reveal confidential client communications and legal advice communicated to a client regardless of whether the advice would tend to reveal confidential client communications. *E.g., United States v. Amerada Hess Corp.*, 619 F.2d 980, 986 (3d Cir. 1980); *Standard Chartered Bank PLC v. Ayala International Holdings (U.S.), Inc.*, 111 F.R.D. 76, 79 (S.D.N.Y.1986) (privilege applies to lawyer-to-client communications "if such communications contain legal advice or reveal confidential information on which the client seeks advice").

Finally, under the broadest approach to the privilege, some courts state that the privilege applies to any communication from an attorney to a client when made in the course of giving legal advice. E.g., *Natta v. Hogan*, 392 F.2d 686, 692–93 (10th Cir.1968); *Schwimmer v. United States*, 232 F.2d 855, 863 (8th Cir.1956), cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956). These courts protect such lawyer-to-client communications regardless of whether they tend to reveal confidential client communications.

Unfortunately, the courts within this circuit share in this diversity of opinion. In *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 720–21 (5th Cir.1985), for example, the court expressed the narrowest view of the privilege, noting that the privilege "protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications." This view was echoed in *Aiken v. Texas Farm Bur. Mutual Ins. Co.*, 151 F.R.D. 621, 623 (E.D.Tex.1993) ("confidential communications . . . by an attorney to his client if it [*sic* ] would tend to disclose the client's confidential communications, are not discoverable"). Intermediate views of the privilege can be found in *Wells v. Rushing,*

755 F.2d 376, 379 n. 2 (5th Cir.1985) (privilege protects lawyer-to-client communications that are "based on, or may disclose, confidential information provided by the client or contain advice or opinions of the attorney") and *E.E.O.C. v. Fina Oil and Chem. Co.*, 145 F.R.D. 74, 76 (E.D.Tex.1992) (privilege applies to lawyer-to-client communications "only if the communications are based on confidential information provided by the client"). And the broadest expression of the privilege is voiced in *In re LTV Securities Litig.*, 89 F.R.D. 595, 602–03 (N.D.Tex. 1981) (privilege applies to "any communication from an attorney to his client when made in the course of giving legal advice"); *see also United States v. Mobil Corp.*, 149 F.R.D. 533, 536 (N.D.Tex.1993).

Although one might ordinarily assume that the *Hodges, Grant & Kaufmann* and *Wells* opinions—which come out of the court of appeals—take precedence over the district court opinions cited, the views expressed in those two cases are merely dicta. Thus, it is fair to say that the state of the law in this circuit is uncertain. Of the two cases decided by this district court, *Aiken* provides only dicta as to the reach of the attorney-client privilege. *Fina Oil* appears to be a holding, but the court's description of the privileged documents at issue is quite sketchy, as is its discussion of the legal issue.

Adding to the confusion is that defendant frequently asserted the privilege when plaintiffs asked Mr. Newcomb about facts that he knew, without inquiring as to how he came to learn of the facts. For example, plaintiffs asked Mr. Newcomb whether he was aware that the FDC problem that plaintiffs allege exists has been a problem since the late 1980's. In response, Mr. Newcomb volunteered that any information he might have about that would have come from conversations with defense counsel and then asserted the attorney-client privilege. Newcomb Dep. II–315–316.

A fair number of cases hold that the attorney-client privilege does not reach facts within the client's knowledge, even if the client learned those facts through communications with counsel. *E.g., B.C.F. Oil Refining, Inc. v. Consolidated Edison Co. of N.Y.*, 168 F.R.D. 161, 165 (S.D.N.Y.1996) ("the attorney-client privilege simply does not extend to facts known to a party that are central to that party's claims, even if such facts came to be known through communications with counsel who had obtained knowledge of those facts through an investigation into the underlying dispute"); *Allen v. West Point–Pepperell Inc.*, 848 F.Supp. 423, 428 (S.D.N.Y.1994) ("A party's knowledge of facts, from whatever source, is not privileged."); *Standard Chartered Bank PLC v. Ayala International Holdings (U.S.), Inc.*, 111 F.R.D. 76, 80 (S.D.N.Y.1986) ("the privilege does not protect facts which an attorney obtains from independent sources and then conveys to his client").

In *Ayala*, for example, the court held that the defendant must disclose all facts of which it was aware, regardless of whether defendant learned those facts from counsel. *Id.* Similarly, *Rattner v. Netburn*, 1989 WL 223059, *12 (S.D.N.Y.1989), held that a client could not refuse to disclose his knowledge of a court ruling even if the client learned of the ruling from counsel. None of these decisions, however, hold that a client may be compelled to reveal legal advice given by counsel. To the contrary, *B.C.F. Oil Refining* expressly draws the distinction between facts communicated by the lawyer to the client, which are discoverable, and legal advice, which is not. 168 F.R.D. at 165. *See also CSC Recovery Corp. v. Daido Steel Co., Ltd.*, 1997 WL 661122, *3–*6 (S.D.N.Y.1997).

A few other basic principles governing the attorney-client privilege bear iteration. Fortunately, none of these is controversial. First, however much the attorney-client privilege protects lawyer-to-client communications, it only protects communications that were made to further the rendition of legal services to the client. *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.1978), cert. denied, 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978). Second, the party asserting the privilege bears the burden of establishing its applicability. *Id.* Finally, a client may waive the attorney-client privilege by voluntarily disclosing a significant portion of a privileged communication. *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340 (9th

Cir.1996); *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156,1162 (9th Cir.1992).

## III. Application of Principles

Applying these principles to the privilege assertions in the Newcomb depositions, I make the following recommendations:

■ 1. Defendant's attorney-client privilege claims should be sustained as to the following questions from the September 12, 2000 deposition:

a. who made the decision to undertake the testing project to identify potential problems with the FDC's in this case;

b. who instructed Compaq employees not to keep notes concerning their testing;

c. did Mr. Zager approve the wording for the postcard mail-out.

Items (a) and (b) identify the substance of a communication and effectively ask whether an attorney made the communication. An affirmative answer to either question would necessarily reveal the substance of an attorney-client communication. Item (c), by asking whether Mr. Zager approved the wording of the postcard mail-out, does the same. Although each of these questions seeks disclosure of a lawyer-to-client communication, in each instance the substance of the communication constitutes legal advice, not a fact. I recommend that the Court reject a reading of the attorney-client privilege that excludes from its embrace communications from counsel that constitute legal advice. "Legal advice of counsel is at the very heart of the attorney-client privilege and is clearly protected." *B.C.F. Oil Refining, Inc. v. Consolidated Edison Co. of N.Y.,* 168 F.R.D. 161, 165 (S.D.N.Y.1996). *B.C.F. Oil Refining* is instructive: Although the court there held that the privilege does not extend to facts known by the client (even if learned from counsel), it also held that the president of a company could not be compelled to disclose whether the company's attorney advised him to tape record a conversation. *Id.* That, said the court, constituted protected legal advice. This is closely analogous to the inquiry in this case regarding who told defendant's employees not to keep notes during their testing.

Similarly, the decision to undertake testing, which was obviously made in reaction to the plaintiffs' allegations, would constitute legal advice if made by counsel. Likewise, counsel's approval or disapproval of the language of the mail-out would constitute legal advice. The manner in which the mail-out was worded could easily have implications for defendant's ability to successfully prosecute its defense of plaintiffs' claims.

2. Defendant's attorney-client privilege claims should be overruled as to the following lines of inquiry from the September 12 deposition:

a. Mr. Newcomb's knowledge regarding the extent to which FDC problems were known in the industry, and how long they had been known;

b. Mr. Newcomb's knowledge regarding communications between Compaq and other computer companies concerning the issues raised in this case, which companies were involved, the nature and content of the discussions.

Defendant claimed privilege as to these lines of inquiry because Mr. Newcomb testified that any knowledge he has as to these matters came from conversations he had with defendant's counsel. Unless this Court is to adopt the broadest view of the attorney-client privilege, however, that is not adequate grounds for asserting the privilege.

■ I recommend that the Court reject the view that the attorney-client privilege reaches all lawyer-to-client communications made in the course of rendering legal advice. Such a view is inconsistent with the command that the privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *United States v. Pipkins,* 528 F.2d 559, 562–63 (5th Cir.1976), cert. denied, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976). The overriding purpose of the attorney-client privilege is to encourage clients to confide in their lawyers. The privilege clearly covers the client's communication to the lawyer. Affording protection to lawyer-to-client communications only if they tend to reveal the client's communication matches the reach of the privilege to its purpose. Moreover, the

decisions of both the court of appeals of this circuit and this district court seem to favor at most protection only of those lawyer-to-client communications that would tend to reveal or are based on confidential client communications. *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 720–21 (5th Cir. 1985); *Wells v. Rushing*, 755 F.2d 376, 379 n. 2 (5th Cir.1985); *Aiken v. Texas Farm Bur. Mutual Ins. Co.*, 151 F.R.D. 621, 623 (E.D.Tex.1993); *E.E.O.C. v. Fina Oil and Chem. Co.*, 145 F.R.D. 74, 76 (E.D.Tex.1992).

 While it is certainly possible that whatever defendant's counsel told Mr. Newcomb was based upon or would tend to reveal confidential client communications, defendant did not establish that. As the party seeking to invoke the privilege, defendant had the burden of establishing each element of the privilege. Its efforts were perfunctory, and fell substantially short of establishing that confidential client communications comprised the source of the information conveyed to Mr. Newcomb. *See Rattner v. Netburn*, 1989 WL 223059, *7 (S.D.N.Y.1989) (conclusory statements inadequate to meet burden of establishing privilege).

Defendant's privilege claim as to these matters should also be rejected in accordance with the many cases cited above that hold the attorney-client privilege does not reach facts within the client's knowledge, even if the client learned those facts through communications with counsel. Mr. Newcomb could have answered the questions posed above—about what he knew—without ever volunteering that he learned the facts from counsel. The questions were aimed at determining the level of Mr. Newcomb's knowledge, not the source of the knowledge. The fact that some (but not all) of the cited cases appear to require disclosure only of those facts that counsel obtained independent of confidential client communications is of no consequence here. Even if this limitation is observed, defendant offered no evidence regarding the source of counsel's information, and thus failed to meet its burden of establishing the applicability of the privilege.

3. In their September 19th letter, plaintiffs requested that I make a recommendation regarding defendant's privilege assertion in response to questions as to whether attorneys were involved in the drafting of the description forwarded to customers of the problem that the Softpaq was designed to address. After reviewing the transcript of the September 12th deposition, however, I find that Mr. Newcomb answered this line of questions fully.

4. During the first Newcomb deposition, Defendant asserted the attorney-client privilege as to numerous lines of inquiry. Some of these were pursued again by plaintiffs during the second deposition without objection or with an objection more circumscribed in scope. Other lines of inquiry were again the subject of privilege claims. I make the following recommendations.

 a. Defendant's privilege claim with respect to Mr. Newcomb's knowledge of the plaintiffs' allegations in this case should be overruled. To the extent that defense counsel informed Mr. Newcomb of the nature of the allegations, counsel was transmitting nonconfidential information to Mr. Newcomb. Plaintiffs did not ask Mr. Newcomb to reveal what defense counsel thought about the merits of the allegations (which would be privileged); they merely asked about the extent to which Mr. Newcomb was familiar with the allegations plaintiffs had made. Although Mr. Newcomb responded slightly more fully to this question in the second deposition, ultimately he resorted to his claim that his knowledge was privileged because what he knew was primarily the result of communications with counsel.

 b. Defendant's attorney-client privilege claim with respect to questions (1) regarding testing done by Compaq to rule out whether Compaq computers have the problem alleged to exist by the plaintiffs and (2) concerning the review and identification of chips to determine if they have the problem alleged by plaintiffs should be overruled. Mr. Newcomb testified in the September 12th deposition that to his knowledge Compaq's testing had revealed a different anomaly and that Compaq had never been able "to correlate to the problem that's being alleged by this case." Newcomb Dep. II–312. Having testified to the results of Compaq's test-

ing, Mr. Newcomb cannot assert the attorney-client privilege to frustrate inquiries into the details of that testing. *See Tennenbaum v. Deloitte & Touche,* 77 F.3d 337, 340 (9th Cir.1996).

c. For the same reasons, defendant's privilege assertions to questions regarding (1) the nature and cause of the problems that necessitated the patch, and (2) Mr. Newcomb's knowledge of testing regarding Softpaq 13456 should be overruled. In light of defendant's insistence that the anomaly it discovered was different from the one alleged by plaintiffs, its position that fixing such a problem was part of the routine course of its business, see, e.g., Newcomb Dep. II–355–357, and the extensive testimony it offered through other deponents regarding the testing process, defendant should not be permitted to assert the attorney-client privilege in response to this line of inquiry. I note that in the second deposition defendant retreated from the sweeping privilege assertion it made in the first deposition in response to this line of inquiry.

 Defendant's assertion of work-product protection is also unavailing. The work-product doctrine does not apply to materials assembled in the ordinary course of business; the primary motivating force must be the anticipation of, or preparation for, litigation. *United States v. El Paso Co.,* 682 F.2d 530, 542 (5th Cir.1982). Moreover, as is true with the attorney-client privilege, defendant cannot make claims as to the results of testing it performed and then use work-product to prevent plaintiffs from making inquiries about its testing process. *See United States v. Nobles,* 422 U.S. 225, 239–40, 95 S.Ct. 2160, 2170–71, 45 L.Ed.2d 141 (1975).

 d. Defendant's assertion of privilege in response to inquiries as to (1) the method by which affected computers were identified, (2) who would receive the Softpaq 13456 mail-out, and (3) Mr. Newcomb's creation of Exhibits 14 and 16 to the first deposition, which identify the computer models and programs for which the Softpaq mail-out was sent, should be overruled. Again, this activity was designed to address a problem distinct from the problem that is the subject of plaintiffs' allegations. These questions thus concern actions that were undertaken in the ordinary course of business, and that were primarily motivated by business, not legal concerns.

 e. Defendant's assertion of privilege in response to questions attempting to link the timing of Softpaq release to the February 28, 2000 hearing in this case should be sustained. This partakes of legal advice. While the decision to address the anomaly was primarily a business decision, defense counsel may well have calculated that the timing of the release could have strategic implications for its representation of defendant in this case. Thus, questions that seek to elicit that counsel may have urged the release of the Softpaq prior to February 28th would constitute privileged legal advice. Mr. Newcomb may not assert a privilege, however, in response to a question that simply asks him to compare the timeframe for developing and distributing the Softpaq 13456 and other softpaqs. Such an inquiry seeks to elicit merely factual matters that would be within Mr. Newcomb's knowledge wholly independent of any communication he might have had with counsel. Indeed, it appears that Mr. Newcomb responded to such a question in the second deposition without asserting the privilege. Newcomb Dep. II–360.

f. Plaintiffs challenge defense counsel's decision to instruct Mr. Newcomb during the first deposition not to answer further questions concerning the service of his subpoena without having Mr. Newcomb assert the privilege against self-incrimination should be sustained. Rule 30(d)(1) of the Federal Rules of Civil Procedure provides that a party may instruct a deponent not to answer a question "when necessary to preserve a privilege." This is exactly what counsel did. He stated that Mr. Newcomb should have the opportunity to consult his own lawyer before taking the dramatic step of asserting the privilege against self-incrimination. Instructing him not to answer was necessary to preserve Mr. Newcomb's ability to assert that privilege in the future. Had he answered the questions, any future assertion of the privilege might have been futile.

## IV. Conclusion

For the reasons stated above, I recommend that defendant's privilege assertions be sustained in part and overruled in part.